**UNITED STATES of America**

v.

**Renford George SMITH, Appellant.**

No. 93–3013.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 24, 1994.

Decided July 8, 1994.

**650**

Robert L. Tucker, Asst. Federal Public Defender, Washington, DC, argued the cause for appellant. With him on the brief was A.J. Kramer, Federal Public Defender, Washington, DC.

James C. Bohling, Asst. U.S. Atty., Washington, DC, argued the cause for appellee. With him on the brief were J. Ramsey Johnson, U.S. Atty. at the time the brief was filed, John R. Fisher, Elizabeth Trosman, Thomas G. Connolly and Odessa P. Jackson, Asst. U.S. Attys., Washington, DC.

Before: MIKVA, Chief Judge; WILLIAMS and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILLIAMS.

Dissenting Opinion filed by Circuit Judge SENTELLE.

STEPHEN F. WILLIAMS, Circuit Judge:

This case poses the question whether a sentencing court may depart below the range indicated by the Sentencing Guidelines where the defendant, solely because he is a deportable alien, faces the prospect of objectively more severe prison conditions than he would otherwise. We hold such departures permissible.

Renford George Smith, a Jamaican citizen, entered the United States illegally in 1991. The following year he was arrested and charged with unlawful possession of five grams or more of cocaine base with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(iii), and pleaded guilty. The district court sentenced him to 70 months imprisonment, the very bottom of the range indicated by the Sentencing Guidelines. He appeals because the court, though expressing a desire to reduce his sentence, declared, "I really don't see any basis for departure."[1] Smith claims such a ground, arguing that in two ways his status as a deportable alien will—adventitiously, as he sees it—subject him to harsher conditions than an otherwise identical citizen. First, his status as a deportable alien renders him

---

1. We agree with the dissent that the trial court's finding is ambiguous. See Dissent at 664–65. If the court believed she had authority to depart but that the circumstances did not warrant departure, her statement to that effect will end the proceeding. See *United States v. Hazel*, 928 F.2d 420, 424 (D.C.Cir.1991).

almost certainly ineligible for the benefits of 18 U.S.C. § 3624(c), which directs the Bureau of Prisons, to the extent practicable, to assure that prisoners spend part of the last 10% of their sentences (but no more than six months) under conditions—possibly including home confinement—that will "afford the prisoner a reasonable opportunity to adjust to and prepare for his re-entry into the community". Bureau of Prisons regulations bar non-U.S. citizens from assignment to a Community Corrections Center except in what appear to be rare circumstances. See Federal Bureau of Prisons, Program Statement 5100.04: Security Designation and Custody Classification Manual, Ch. 2–9 (June 15, 1992).[2] More important, Bureau of Prisons policy prevents him from being assigned to serve *any* part of his sentence in a minimum security prison, subject to the same exceptions as community confinement. *Id.* at Ch. 2–9.[3] Whether such differences in probable conditions of confinement can ever justify a downward departure presents a threshold question of law that we decide *de novo. United States v. Williams,* 980 F.2d 1463, 1466 (D.C.Cir.1992).

\*　　\*　　\*

Sentencing courts are authorized to make downward departures in order to adjust for "aggravating or mitigating circumstance[s]" not adequately taken into account by the Sentencing Commission in the promulgation of its guidelines:

**(b) Application of guidelines in imposing a sentence.** The court shall impose a sentence of the kind, and within the range, referred to in subsection (a)(4) unless the court finds that there exists *an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission* in formulating the guidelines that should result in a sentence different from that described. In determining whether a circumstance was adequately taken into consideration, the court shall consider only the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission.

18 U.S.C. § 3553(b) (emphasis added).

■ The first question is whether § 3553(b) reaches offender characteristics not related to culpability, an issue we left open in *United States v. Mason,* 966 F.2d 1488, 1495–96 (D.C.Cir.1992). We believe that although the controlling statutes are ambiguous on the point, the Sentencing Commission has answered it affirmatively, and that that answer is an entirely reasonable reading of the statutes. See *United States v. Doe,* 934 F.2d 353, 359 (D.C.Cir.1991) (courts defer to reasonable interpretations by Commission); cf. *Williams v. United States,* —— U.S. ——, —— - ——, 112 S.Ct. 1112, 1119–20, 117 L.Ed.2d 341 (1992).

There seems no doubt that "aggravating or mitigating circumstances" may encompass characteristics of the *offender* as well as of the crime. Indeed, Congress directed the Sentencing Commission "to consider whether the following matters, among others, with respect to a defendant, have any relevance" to the appropriate sentence, and then enumerated 11 items, ten of which are offender characteristics such as age, physical condition, family ties, and criminal history. 28 U.S.C. § 994(d).[4] The Commission has con-

2. A deportable alien is automatically ineligible for such benefits unless (1) he meets three qualifications—verified strong family/community ties in the United States, a verified history of domicile in the United States (five or more years), and a verified history of stable employment in the United States, or (2) the Immigration and Naturalization Service determines that deportation proceedings will not be initiated, *id.,* or (3) the Regional Director of the Bureau of Prisons waives the requirement, *id.* at Ch. 2–6. See also Ch. 7–25–26, Ch. 8–1, and Ch. 2–1.

3. Before the trial court Smith suggested another claim, which he here expressly abjures, Appellant's Brief at 9 n. 7, that the prospect of his incarceration in an Immigration & Naturalization Service detention center between his release and his actual deportation also calls for an adjustment. See *United States v. Restrepo,* 999 F.2d 640, 646 (2d Cir.1993) (rejecting such a claim); cf. *United States v. Soto,* 918 F.2d 882, 884–85 (10th Cir.1990).

4. In full, 28 U.S.C. § 994(d) reads as follows:

(d) The Commission in establishing categories of defendants for use in the guidelines and policy statements governing the imposition of sentences of probation, a fine, or imprisonment, governing the imposition of other authorized sanctions, governing the size of a fine or

sidered the listed items, stating its conclusions as Policy Statements in Chapter 5, Part H, of the Guidelines—"Specific Offender Characteristics". There the Commission not only authorizes judges to take some of these characteristics into account, but makes plain that they may be a basis for departure even in circumstances where their connection to the sentence has nothing to do with moral blameworthiness.

Most telling are §§ 5H1.1 and 5H1.4, which suggest home detention as a substitute for imprisonment where, because of extreme age or disability, such detention would be as "efficient" as prison but less costly. In effect these policy statements identify extreme age and disability as characteristics that make it possible to achieve the goals of a prison sentence (incapacitation, retribution, etc.) with an alternative confinement. The Commission accordingly authorized an adjustment of sentence—in type, though not in duration—for reasons having nothing to do with blameworthiness.

The Commission's treatment of family responsibilities reflects a similar view. Besides including family ties and responsibilities among the matters to be considered under § 994(d), Congress directed the Commission to assure that the guidelines reflect the "general inappropriateness of considering ... family ties and responsibilities". 28 U.S.C.

§ 994(e). Nonetheless, the Commission has identified a special situation where the sentencing court should consider them. Policy Statement § 5H1.6 states that "[f]amily responsibilities that are complied with" are relevant to the amount of proper restitution or fines.[5] Although obviously compliance with family responsibilities is a moral good, the policy does not seem to rest on that point, but rather on the idea that such responsibilities are a genuine burden that a sentencing court should treat somewhat the way it would a lesser income—itself of questionable relation to blameworthiness, yet to be taken into account in choosing fines or restitution, see §§ 5E1.2(a), (d)(2), (d)(3), (f) and (g).

Although the policy statements of Chapter 5, Part H, are not expressly linked to § 3553(b), they appear necessarily to be an interpretation of that section. Part H "address[es] ... the determination of whether a sentence should be *outside* the applicable guideline range", see Introductory Commentary to § 5H1 (emphasis added), and § 3553(b) appears to be the only route by which courts may do so.

We see nothing unreasonable in the Commission's view that "mitigating circumstances" include factors unrelated to moral blameworthiness. In *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), as we noted in *Mason*, the Supreme

the length of a term of probation, imprisonment, or supervised release, and governing the conditions of probation, supervised release, or imprisonment, shall consider whether the following matters, among others, with respect to a defendant, have any relevance to the nature, extent, place of service, or other incidents of an appropriate sentence, and shall take them into account only to the extent that they do have relevance—
  (1) age;
  (2) education;
  (3) vocational skills;
  (4) mental and emotional condition to the extent that such condition mitigates the defendant's culpability or to the extent that such condition is otherwise plainly relevant;
  (5) physical condition, including drug dependence;
  (6) previous employment record;
  (7) family ties and responsibilities;
  (8) community ties;
  (9) role in the offense;
  (10) criminal history; and

  (11) degree of dependence upon criminal activity for a livelihood.
The Commission shall assure that the guidelines and policy statements are entirely neutral as to the race, sex, national origin, creed, and socioeconomic status of offenders.

**5.** Section 5H1.6 appears to be an authorization of a *departure*, as the Commission set no "guidelines" for the court's incorporation of family responsibilities into the selection of a fine, in sharp contrast to its formula setting specific upper and lower limits for fines in each offense level. U.S.S.G. § 5E1.2(c)(3). Whether trial court consideration of such responsibilities is technically a departure or is in some way part of the "guidelines" sentence, compare Dissent at 661, would seem to make little difference. It is hard to believe that a factor relevant to establishment of a guidelines sentence is not either a mitigating or aggravating circumstance. If so, it may be considered as a basis for departure so long as "not adequately taken into consideration by the Sentencing Commission". 18 U.S.C. § 3553(b).

Court treated "mitigating" as a very broad term, requiring that juries in death cases be allowed to consider, "*as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Id.* at 604, 98 S.Ct. at 2965, quoted in *Mason,* 966 F.2d at 1495. Further, any effort to draw a line in terms of blameworthiness is not so easy as may first appear. Many of the offense characteristics that the Commission addresses in § 5K2 of the Sentencing Guidelines—entitled "Departures"—are only dimly related to moral blameworthiness. Those that go merely to *consequences* of the criminal conduct (see § 5K2.1 (death), § 5K2.2 (physical injury), § 5K2.3 (extreme psychological injury), § 5K2.5 (property damage or loss)), as opposed to intention and the conduct itself, seem at best to be classifiable as "moral luck". See *United States v. Martinez,* 16 F.3d 202, 206 (7th Cir.1994).

As we noted in *Mason,* the Second Circuit has understood "mitigating circumstances" to extend beyond degrees of culpability. In *United States v. Lara,* 905 F.2d 599 (2d Cir.1990), the court found departure permissible because of the defendant's "potential for victimization" due to his "diminutive size, immature appearance and bisexual orientation." *Id.* at 601. It appeared likely that the prison authorities, in order to protect him from sexual exploitation, would subject him to solitary confinement. *Id.* In *Mason* we observed that this prospect, while it did not "reduce the defendant's moral culpability, ... was linked to the retributive purpose of the criminal sanction in that the additional punishment of solitary confinement offset the reduction in his sentence." 966 F.2d at 1496 n. 7. See also *United States v. Tucker,* 986 F.2d 278, 280 (8th Cir.1993) (extreme vulnerability can provide a proper predicate for departure, although court concludes that the defendant was not especially prone to victimization); *United States v. Long,* 977 F.2d 1264, 1277–78 (8th Cir.1992) (government accepts the principle of departure for extreme vulnerability but successfully contests its application).

The Dissent suggests that the Commission's post-*Lara* amendment to § 5H1.4, adding "appearance, including physique" to the aspects of physical condition that are "not ordinarily" relevant, represents a disapproval of *Lara.* Dissent at 660. The Commission's stated explanation is more limited: "In several cases, courts have departed based upon the defendant's alleged vulnerability to sexual assault in prison due to youthful appearance and slender physique. This amendment expresses the Commission's position that such grounds are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range." *Notice of Proposed Amendments to Sentencing Guidelines, Policy Statements, and Commentary,* 56 Fed.Reg. 1846, 1887 (Jan. 17, 1991). This is certainly not an outright disapproval of *Lara,* for the court there plainly found the case extraordinary, not ordinary, 905 F.2d at 603, and in any event rested not so much on appearance *per se* as on the "extreme vulnerability" of the particular defendant, *id.* at 602, manifested through *actual* prison victimization of such intensity that the authorities planned assignment to solitary confinement for the defendant's protection, *id.* at 602–03. Moreover, the Commission is not diffident about naming cases that it overrules. See, e.g., *Notice of Submission to Congress of Amendments to the Sentencing Guidelines,* 59 Fed.Reg. 23,608, 23,609 (May 5, 1994) (citing holdings contrary to proposed amendment to Commentary on § 5G1.2); *Notice of Final Action Regarding Amendments to Sentencing Guidelines and Policy Statements,* 58 Fed.Reg. 52,527, 52,529–30 (Oct. 8, 1993) (citing cases in disagreement with proposed amendment to application notes on § 3B1.1). So its focus on appearance alone may well be read as simply trying to prevent extension of *Lara* along that dimension. The Commission certainly did not suggest a principle that a factor cannot be a mitigating circumstance unless it bears on moral culpability.

Not only does the Commission appear reasonably to understand "mitigating circumstances" to include matters unconnected to blameworthiness, it has imposed very few categorical limits on what may qualify. The Guidelines state:

Section 5H1.10 (Race, Sex, National Origin, Creed, Religion, and Socio–Economic Status), § 5H1.12 (Lack of Guidance as a Youth and Similar Circumstances), the third sentence of § 5H1.4 (Physical Condition, Including Drug Dependence and Alcohol Abuse), and the last sentence of § 5K2.12 (Coercion and Duress) list several factors that the court cannot take into account as grounds for departure. *With those specific exceptions, however, the Commission does not intend to limit the kinds of factors, whether or not mentioned anywhere else in the guidelines, that could constitute grounds for departure in an unusual case.*

Guidelines Manual, Ch. 1, Pt. A, § 4(b) (emphasis added). Elsewhere, the Commission states more simply: "If ... a particular case presents atypical features, the Act allows the court to depart from the guidelines and sentence outside the prescribed range." *Id.* § 2.

■■■■ The government here claims that the bar on consideration of national origin, quoted above and reflecting Congress's direction that the Commission "assure that the guidelines and policy statements are entirely neutral as to the race, sex, national origin, creed, and socioeconomic status of offenders", 28 U.S.C. § 994(d), bars a departure for the effect of deportable alien status on the defendant's prison conditions. But as the court said in *United States v. Restrepo,* 999 F.2d 640 (2d Cir.1993), "National origin, *i.e.,* having been born in a particular country, however, is not synonymous with 'alienage,' *i.e.,* simply not being a citizen of the country in which one is present." *Id.* at 644. Nor is deportability limited to all national origins other than U.S., for even a person born a U.S. citizen may be deportable if later denationalized. See 8 U.S.C. §§ 1251–53, 1481.

Although the *Restrepo* court did not view the statutory bar on consideration of national origin as an obstacle to a departure for deportable aliens who would suffer more severe confinement on account of their status, it nonetheless found such departures unauthorized. 999 F.2d at 644–46. First, addressing Congress's direction in § 3624(c) that the Bureau of Prisons to the extent practicable

make a special community assignment for the last 10% of a sentence of a prisoner's term, the court observed that since that provision focuses on reentry into a community, Congress may not have intended it to apply to deportable aliens at all. *Id.* at 645. We agree. But the Bureau of Prisons has taken a different view, not categorically denying deportable aliens community confinement, but granting the benefit to those who meet the special requirements of Program Statement 5100.4. As the Bureau of Prisons appears simply to limit deportable aliens' access to community confinement under § 3624(c) in the same way as it limits their access to minimum security facilities generally (i.e., *before* the last 10% of the sentence), we think that possible offsetting departures for either should be subject to the same analysis.

In a discussion applicable to both, the *Restrepo* court offered the following reason for rejecting departures. It noted that Congress had given the Bureau of Prisons broad discretion over assignment of prisoners among correctional facilities, and said that "the court's disapproval of the Bureau's exercise of its discretion to deny [a] prisoner reassignment to a minimum-security facility is ... an inappropriate basis for departure." 999 F.2d at 645–46. Besides characterizing the departure as such a "disapproval", the court appeared to regard it as an encroachment on the Bureau's discretion. *Id.;* see also *United States v. Nnanna,* 7 F.3d 420, 422 (5th Cir.1993) (citing *Restrepo* ).

We do not see why a downward adjustment by the court, in anticipation of the Bureau's application of assignment policies, is any more of a disapproval or encroachment than was the departure made in *Lara* in anticipation of the defendant's expected assignment to solitary. The Second Circuit there appeared not to question the reasonableness of the prospective assignment. It simply noted that the severity of the defendant's term would be "exacerbated by his placement in solitary confinement", *Lara,* 905 F.2d at 603, so that, as we said in *Mason,*

it could be "offset" by a reduction in sentence. *Mason,* 966 F.2d at 1496 n. 7.[6]

There is a second aspect to the Bureau's discretion, however, that gives us pause and suggests to us that the circumstances justifying a downward departure on account of the deportable alien's severity of confinement may be quite rare. The range of factors that the Bureau may consider in its assignments is almost illimitable, cf. *Wolfish v. Levi,* 573 F.2d 118, 125 (2d Cir.1978) (noting breadth of congressional mandate to Attorney General and inferring that administration of federal prisons is generally "committed to agency discretion by law"), *rev'd on other grounds, Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), and it may be hard for a sentencing court to say whether the fortuity of being a deportable alien is likely to have any independent effect. Partly this is due to the basic complication of assessing any multifactor decision, see Lon L. Fuller, *The Forms and Limits of Adjudication,* 92 Harv. L.Rev. 353, 394–404 (1978) (limits of adjudication in the face of "polycentric" problems), especially a decision that will not yet have been made and may in any event never be backed by any formal explanation. Further, if deportable aliens who are ineligible for minimum security facilities are not so very different from U.S. citizens who are typically assigned to higher security institutions, then it might be hard to say that their status *alone* has caused an increase in severity. The Bureau of Prisons policy on the matter, allowing assignment to a minimum security prison or community corrections center for deportable aliens who have a history of strong family or community ties, of domicile in the U.S. of five years or more, and of stable employment, Program Statement 5100.04: Security Designation and Custody Classification Manual, Ch. 2–9, see note 1 above, suggests that ineligibility stems primarily from the greater likelihood of escape, so that status as a deportable alien is little more than a proxy for factors the Bureau always considers. To put it another way, in trying to assess whether deportable alien status *per se* will really affect assignment, it may be hard to identify an *otherwise identical* citizen to serve as a benchmark. On the other hand, if a deportable alien is assigned to a more drastic prison than otherwise solely because his escape would have the extra consequence of defeating his deportation, then the defendant's status as a deportable alien would have clearly generated increased severity and thus might be the proper subject of a departure. The Bureau of Prisons Program Statement suggests that this is not normally the case, but we cannot say that deportable alien status will never be an independent cause of a substantial increment in severity.

Further, we do not mean to suggest that a departure is in order whenever a factor unrelated to a prisoner's just deserts may affect the severity of his confinement. For a departure on such a basis to be reasonable the difference in severity must be substantial and the sentencing court must have a high degree of confidence that it will in fact apply for a substantial portion of the defendant's sentence. Finally, as the defendant's status as a deportable alien is by no means necessarily unrelated to his just deserts, even a court confident that the status will lead to worse conditions should depart only when persuaded that the greater severity is undeserved. Thus the court will fulfil the Guidelines' command that such departures will be "highly infrequent". U.S.S.G., Ch. 1, Pt. A, § 4(b).

Thus, although we conclude that a downward departure may be appropriate where the defendant's status as a deportable alien is likely to cause a fortuitous increase in the severity of his sentence, we express no opinion on whether a departure is appropriate

---

**6.** *Restrepo* was followed without further explanation in *United States v. Mendoza–Lopez,* 7 F.3d 1483, 1487 (10th Cir.1993), and in *United States v. Nnanna,* 7 F.3d 420, 422 (5th Cir.1993). *United States v. Alvarez–Cardenas,* 902 F.2d 734 (9th Cir.1990), rejected a defendant's unexplained claim that his status as a deportable alien was grounds for a downward departure. In that context, the court indeed observed that the mere fact of deportability did not render his crime serious or speak to his character. *Id.* at 737. Thus, *Lara* and its sequelae appear to be the only cases expressly addressing the issue of departures for circumstances that accidentally lead to an increase in the objective severity of the defendant's conditions of incarceration. Cf. Dissent at 668.

here. See *United States v. Beckham*, 968 F.2d 47, 55 (D.C.Cir.1992) (remand for resentencing when district court unaware of authority for downward departure); see also *United States v. Hazel*, 928 F.2d 420, 424 (D.C.Cir.1991) (sentence within guideline range not reviewable so long as district court made no error of law or mistake of fact) (cf. *United States v. Zine*, 906 F.2d 776, 778 (D.C.Cir.1990)); *United States v. Ogbeide*, 911 F.2d 793, 795 (D.C.Cir.1990) (permissible departure reviewable only for reasonableness; see also 18 U.S.C. § 3742(f)(1) & (2).

Accordingly, we reverse and remand for resentencing.

*So ordered.*

SENTELLE, Circuit Judge, dissenting:

In 1984, concerned that the then-existing sentencing system "had two 'unjustifi[ed]' and 'shameful' consequences," *Mistretta v. United States*, 488 U.S. 361, 366, 109 S.Ct. 647, 652, 102 L.Ed.2d 714 (1989) (quoting S.REP. No. 98–225 (1983)) ("Report"), Congress enacted the Sentencing Reform Act of 1984, currently codified at 18 U.S.C. § 3551 *et seq.* (1988) ("the Act"). The first of those unjustified and shameful consequences "was the great variation among sentences imposed by different judges upon similarly situated offenders." *Mistretta*, 488 U.S. at 366, 109 S.Ct. at 652.[1] Viewing that consequence as "a serious impediment to an evenhanded and effective operation of the criminal justice system," Congress created the Sentencing Commission and instructed and empowered that Commission to create a guideline system designed to "reduc[e] sentencing disparities while retaining the flexibility needed to adjust for unanticipated factors arising in a particular case." *Id.* at 366–67, 109 S.Ct. at 652 (citing Report at 78–79, 62).

Today's decision rejects the congressional goal of the Sentencing Reform Act and returns us to the days of indeterminate and judicially-individualized sentencing thought to be undone by the Act. Though I will grant that many judges, and no doubt defen-

dants, would find this a good thing, I think it beyond our power and I respectfully dissent.

### ANALYSIS

Sentencing under the guidelines is, in the first instance, a mechanical process, with discretion occurring only as to choices within a range determined under the guidelines and, in a limited number of cases, departures from that range. That process is set forth in the General Application Principles constituting Part B of the guidelines. Specifically, the "Application Instructions" oblige the sentencing judge to

(a) Determine the applicable offense guideline section from Chapter Two....

(b) Determine the base offense level and apply any appropriate specific offense characteristics contained in the particular guideline in Chapter Two in the order listed.

(c) Apply the adjustments as appropriate related to victim, role, and obstruction of justice for Parts A, B, and C of Chapter Three.

(d) ... [R]epeat steps (a) through (c) [for multiple offenses]....

(e) Apply the adjustment as appropriate for the defendant's acceptance of responsibility....

(f) Determine the defendant's criminal history category as specified in Part A of Chapter Four. Determine from Part B of Chapter 4 any other applicable adjustments.

(g) Determine the guideline range in Part A of Chapter Five that corresponds to the offense level and criminal history category determined above.

(h) For the particular guideline range, determine from Parts B through G of Chapter Five the sentencing requirements and options related to probation, imprisonment, supervision conditions, fines, and restitution.

(i) Refer to Parts H and K of Chapter Five, Specific Offender Characteristics and Departures, and to any other policy

---

1. "The second was the uncertainty as to the time the offender would spend in prison" due to the parole system existing before the Act. *Mistretta*,

488 U.S. at 366, 109 S.Ct. at 652. That consequence is not relevant to the current decision.

statements or commentary in the guidelines that might warrant consideration in imposing sentence.

U.S.S.G. § 1B1.1 (1993).

Thus, in sentencing a particular defendant for a particular offense, the sentencing court follows a clearly delineated roadmap set forth in § 1B1.1. That roadmap will lead the court to a clearly established range set forth in the one-page sentencing table at § 5A of the guidelines. *See* Appendix, *infra*. It is only after the district judge has reached the determined range that she is free to depart from this mechanical process and make a discretionary decision as to what sentence to assign within that range or, in rare instances, whether to depart from the range.

In the present case, both parties and all members of this panel agree that the district judge correctly followed the § 1B1.1 roadmap to arrive at the correct range—70 to 87 months. She then chose a specific sentence within that range and entered a judgment of confinement for a period of 70 months, to be followed by a period of supervised release. Neither the appellant nor my colleagues quarrel with the sentencing judge's exercise of choice within the range. Indeed, appellant would not be able to appeal from the sentencing court's discretionary choice of an appropriate sentence within the guideline range. Under the Act, a defendant can appeal a sentencing decision if the sentence "(1) was imposed in violation of law; (2) was imposed as a result of an incorrect application of the sentencing guidelines ...; or (3) ... was greater than ... the sentence specified in the applicable guideline range...." 18 U.S.C. § 3742(a)(1)–(3); *United States v. Hazel*, 928 F.2d 420, 422 (D.C.Cir.1991). Consequently, the only possible area of error is the judge's refusal to depart from the guideline range at the sentencing step set forth in U.S.S.G. § 1B1.1(i). It is this refusal to depart that appellant attacks. And it is this refusal to depart that my colleagues—erroneously—find to be error.

## I. THE MAJORITY'S APPROACH

It is indisputable that a judge's refusal to depart from a guideline sentence is not of itself appealable. "Decisions not to depart downward from an applicable guidelines range. are generally reviewable only to the extent that they were imposed in violation of law or were imposed as a result of an incorrect application of the Sentencing Guidelines." *United States v. Ortez*, 902 F.2d 61, 63 (D.C.Cir.1990). Although it may not exhaust the universe of possibilities, this usually means that a defendant may not appeal from a judge's decision not to depart unless she has "misunderstood the scope of [her] sentencing authority under the guidelines because that ... would be a misapplication of the guidelines," reviewable under 18 U.S.C. § 3742, *Hazel*, 928 F.2d at 423. The majority hangs its decision to reverse on a weak hook, supposing that the district judge *incorrectly* believed she could not execute a downward departure on the basis of the defendant's status as an illegal alien. Because I believe the district judge was entirely correct in her assessment of her own lack of power,[2] I dissent from my colleagues' conclusion that we have the authority to review and reverse her decision based upon that correct assessment.

The majority's conclusion that a sentencing court has authority under the guidelines to effect a downward departure from an established guideline range based on the status of the defendant as an illegal alien rests on fundamental errors in its understanding of guideline sentencing. The majority first totally misunderstands the role of, and therefore misapplies, 28 U.S.C. § 994(d); second, defers to a Sentencing Commission construction of an ambiguous statutory term that the Commission never made, reaching a bizarre result and setting a dangerous precedent; and finally, employs a too-critical reading of the record, inconsistent with the proper standard of review. I shall address each of these flaws in turn.

### A. *The Statutory Interpretation*

In analyzing the scope of the district court's authority to depart based on the allegedly mitigating circumstance that the defendant has previously broken another law

---

**2.** If indeed she made such an assessment, *see* IE, *infra*.

(*i.e.*, he is an illegal alien) I begin where the majority does—with 18 U.S.C. § 3553(b). As the majority correctly relates, that section mandates that the court impose a sentence within the range determined by the guidelines except when it finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that" determined by the guideline range. *See* 18 U.S.C. § 3553(b). As the majority correctly notes, to determine the range of discretion conferred by this exception requires a court to define the term "mitigating circumstance." But having correctly identified the question, the majority turns incorrect at the next step.

In the present case, the defendant asked the district court to depart downward on the basis of a feature in the status of the defendant—specifically that he is an illegal alien.[3] The next question then is whether status characteristics can be mitigating circumstances within the meaning of § 3553(b). In seeking a basis for its conclusion that they can, the majority looks to 28 U.S.C. § 994(d) and finds therein a list of eleven characteristics, at least ten of which are related to status.[4] In this listing, the majority finds a premise for its ultimate conclusion that another status characteristic, illegal alienage, can be a mitigating circumstance. The first problem with this reasoning is that 28 U.S.C. § 994(d) has nothing whatsoever to do with mitigating circumstances under 18 U.S.C. § 3553(b).

28 U.S.C. § 994 was the charge to the Sentencing Commission setting out the scope of its undertaking. Indeed, the caption to that section in the statutory text reads: "Duties of the Commission." 28 U.S.C. § 994. That section is not directed to the sentencing of defendants, but rather toward the creation of a set of guidelines, which are then to be the framework for sentencing

defendants. In furtherance of that congressional purpose, the statute charges the Commission with the duty to promulgate guidelines for use of sentencing courts and general policy statements regarding application of the guidelines. *See* 28 U.S.C. §§ 994(a)(1) & (2). The statute then directs the Commission, *"in establishing categories of offenses for use in the guidelines and policy statements,"* to consider whether seven listed characteristics of an offense "among others, have any relevance to the nature, extent, place of service, or other incidents of an appropriate sentence." 28 U.S.C. § 994(c). It further directs, as to those offense characteristics, that the Commission is to take them into account in establishing the guidelines "only to the extent that they do have relevance." *Id.*

A glance at the sentencing table appended to this dissent reveals that the process of determining the sentencing range is the reading of a grid. *See* App., *infra.* The vertical axis of the grid is labeled "Offense Level" and is determined by applying the offense level guidelines created by the Commission in obedience to § 994(c) and promulgated in Chapters Two and Three of the United States Sentencing Guidelines, entitled "Offense Conduct" and "Adjustments" respectively. It is here that the Commission has carried out the charge of 28 U.S.C. § 994(c), and there is nothing left for a court to do to carry out that section, nor does § 994(c) direct a court to do anything. The court's duty lies in carrying out the guidelines. The offense characteristics set forth in 28 U.S.C. § 994(c) are to be considered by the court only to the extent that the guidelines make them factors for consideration in determining the point upon the vertical axis at which the judge places her pencil before she runs across the page to intersect the column governed by the horizontal axis, labeled "Criminal History Category (Criminal History Points)."

---

**3.** While I would not couch this characteristic in status terms, but rather consider it to be conduct—that is, the defendant is in continuing violation of the immigration laws—in order to respond to the majority's analysis, I accept their framework for purposes of argument.

**4.** For the full text of that section, see Maj. op. at 651 n. 3.

That brings us to the subsection of § 994 upon which the majority relies. Just as subsection (c) directed the Commission to review characteristics of offenses, decide to what extent they are relevant to the determination of an appropriate sentence, and take them into account "only to the extent that they do have relevance," subsection (d) directs the Commission to conduct the same analysis as to the eleven listed characteristics, "among others," of *defendants. See* 28 U.S.C. § 994(d). That is, the *Commission* is to consider whether those *offender* characteristics "have any relevance to the nature, extent, place of service, or other incidents of an appropriate sentence," and, having made that determination, "take them into account only to the extent that they do have relevance" *in designing the guidelines. Id.*

The subsection plainly imposes no duties on courts, has nothing to do with mitigating circumstances, and has nothing to do with the application of the guidelines. It is again a charge to the Commission as to what it is to do in the promulgation of the guidelines themselves. Again, the Commission has carried out its statutory charge. As the majority itself notes, the Commission has determined and specified in § 5H of the guidelines the extent to which each of several characteristics has relevance: age, 28 U.S.C. § 994(d)(1) and U.S.S.G. § 5H1.1; education and vocational skills, §§ 994(d)(2) & (3) and U.S.S.G. § 5H1.2; mental and emotional condition, § 994(d)(4) and U.S.S.G. § 5H1.3; physical condition, including drug dependence, § 994(d)(5) and U.S.S.G. § 5H1.4; employment record, § 994(d)(6) and U.S.S.G. § 5H1.5; family ties and responsibilities and community ties, §§ 994(d)(7) & (8) and U.S.S.G. § 5H1.6. As to each, the Commission concluded that the status characteristics "are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range." *See* U.S.S.G. §§ 5H1.1–5H1.6.

As to the remaining factors specified in § 994(d)—that is, "Role in the Offense," "Criminal History," and "Dependence upon Criminal Activity for a Livelihood"—the Commission did deem those relevant, and so indicated in policy statements codified at

U.S.S.G. §§ 5H1.7, 5H1.8 and 5H1.9. It specifically included role in the offense as an adjustment factor in the computation of offense level for purposes of the sentence table under Chapter Three, Part B of the guidelines. It specifically included criminal history, as computed under Chapter Four of the guidelines, as the determinant of the horizontal axis of the § 5(a) grid. Finally, it specifically included dependence upon criminal activity for a livelihood as a factor in computing the applicable criminal history level on the horizontal axis under Chapter Four, Part B.

In short, 28 U.S.C. § 994(d) gave the Commission certain instructions as to how it was to construct the guidelines. The Commission has followed those instructions and has constructed the guidelines. Neither the statutory scheme, its history, its structure, nor its language gives any suggestion that § 994(d) has anything to do with determining departures or defining mitigating circumstances. My colleagues base their conclusion that the ambiguous statutory term "mitigating circumstances" could include status characteristics of the offender, on the supposition that 28 U.S.C. § 994(d) has something to do with the construction of that term. As that section is a charge to the Commission having no relationship to "mitigating circumstances," their analysis is flawed at its foundation and must fall.

### B. "Deference"

The second leg of the majority's analysis is the proposition that we owe deference to the Commission's construction of the ambiguous term "mitigating circumstances," and that the Commission has construed this term in a fashion impelling us toward the conclusion the majority reaches. As to the first premise of this proposition there can be no doubt. The majority is quite correct that the Commission's interpretation of its governing statute is entitled to deference under *Chevron U.S.A. Inc. v. NRDC,* 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984). Thus, when the Commission has construed an ambiguous statutory term such as "mitigating circumstances," "we can ask only whether [that interpretation] is a reasonable and permissible construction of" the relevant

statutory section. *United States v. Doe*, 934 F.2d 353, 359 (D.C.Cir.1991).

The majority's conclusion that "we see nothing unreasonable in the Commission's view that 'mitigating circumstances' include factors unrelated to moral blameworthiness," Maj. op. at 652, does not, however, follow. It might follow if the Commission had ever expressed such a view, but the Commission has not. Each of the examples the majority draws from Chapter Five, Part H of the guidelines to support the proposition that status characteristics of the offender can be mitigating factors lists one or more of the specific offender characteristics dictated by Congress. In each instance, the governing guideline declares explicitly that such characteristics are "not ordinarily relevant in determining whether a sentence should be outside the applicable Guideline range." *See* U.S.S.G. §§ 5H1.1–5H1.6. Based upon these determinations by the Commission, my colleagues somehow reach the conclusion that the Commission has made a determination that a broad category of characteristics, including those listed in Chapter Five, Part H *are* relevant to determining whether a sentence should be outside the applicable guideline range.

I recognize the theoretical possibility that the Commission's language allows characteristics "not ordinarily relevant" to a decision to depart to become relevant under extraordinary circumstances. I have no doubt that the Commission intended to leave open that theoretical possibility. But I cannot follow the majority's reasoning that the Commission's wise nod to the possibility of unforeseen circumstances constitutes a deference-worthy interpretation of "mitigating circumstances" to include, not only the specific offender characteristics expressly described as "not ordinarily relevant," but also any other characteristic that might be lumped with them in a vaguely defined, broadly inclusive category of status characteristics. My colleagues may find the following reasoning compelling: the Commission has expressly determined that "age [, for example,] is not ordinarily relevant to a decision to depart from Guideline Sentencing," therefore, we are bound under *Chevron*, as applied in *Doe*,

to hold that alienage *is* relevant to a decision to depart, and further that it is reversible error for a district judge to rule that she cannot use this status characteristic as a basis for departure. I do not find such logic compelling.

The majority's proof that the Commission has made such a determination is unconvincing. The majority cites §§ 5H1.1 & 5H1.4, which discuss the relevance of "extreme age" and serious infirmity to a determination that "home detention may be as efficient as, and less costly than, imprisonment," to support the proposition that the Commission has made the deference-worthy determination upon which they rely. Admittedly, this argument does establish that the Commission has at least considered the possibility that there may be specific offenders whose personal circumstances of age and infirmity are so extreme as to warrant a departure from sentencing norms. If that were the question before us, I might concur with the majority that the Commission has offered a determination to which we should defer. However, that is not the question before us.

Most surprisingly, in attempting to support the proposition that the Commission's treatment of the specific offender characteristics listed in Chapter 5, Part H of the guidelines must be considered as mitigating factors by the sentencing court, the majority cites *United States v. Lara*, 905 F.2d 599 (2d Cir.1990). In *Lara*, the Second Circuit held that a district court did not err in downwardly departing from the sentencing guideline range on the basis of "the defendant's immature appearance," which would likely have caused the severity of his incarceration to be "exacerbated by his placement in solitary confinement." *Lara*, 905 F.2d at 603. What the majority does not note is that the Commission made it plain in its next amendments to the guidelines that it did not share the Second Circuit's views on the relevance of the defendant's appearance as a mitigating factor.

At the time of the *Lara* decision, § 5H1.4 read, in pertinent part, "[p]hysical condition is not ordinarily relevant in determining whether a sentence should be outside the guidelines or where within the guidelines a

sentence should fall." *See* U.S.S.G., App. C, at 214 (1993). In 1991, the Commission amended that part of the guideline section to read, "[p]hysical condition or appearance, including physique, is not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range." *See id.* at 215. In the pre-amendment version of the guidelines, the next sentence read, "However, an extraordinary physical impairment may be a reason to impose a sentence other than imprisonment." *Id.* at 214. In the amended version, the Commission expanded upon its policy statement. The sentence now reads, "However, an extraordinary physical impairment may be a reason to impose a sentence below the applicable guideline range; *e.g.,* in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment." *Id.* at 215. I would submit, therefore, that the policy statements comprising Part H of Chapter Five of the guidelines, insofar as they represent deference-worthy interpretations by the Commission, compel exactly the opposite result than that reached by the majority.[5]

Equally unconvincing is the majority's reliance on the Policy Statement in § 5H1.6 to the effect that " '[f]amily responsibilities that are complied with' are relevant to the amount of proper restitution or fines." Maj. op. at 652. Indeed, the Commission did take into account family responsibilities that are complied with in computation of fines and restitution, along with income levels of the person being sentenced. *See* §§ 5E1.2(a); 5E1.2(d)(2); 5E1.2(d)(3); 5E1.2(f); 5E1.2(g). However, the majority's reliance on the family responsibility language of § 5H1.6 and on the cited sections of § 5E1 not only is inapposite, but reflects a complete misunderstanding of the guidelines.

The Commission has determined that the family and income characteristics set forth there *are* relevant to the computation of the sentencing level. That being the case, the Act makes plain that they are irrelevant to a departure decision. Section 3553(b) of title

18, which, unlike 28 U.S.C. § 994, is actually directed toward the duties of the sentencing judge, describes the sort of mitigating circumstances that may be taken into account in determining whether or not to depart from the guideline range. That section mandates that the court sentence within the range unless it finds "an aggravating or mitigating circumstance of a kind, or to a degree, *not adequately taken into consideration by the Sentencing Commission* in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. § 3553(b) (emphasis added). The Commission did consider the obvious relevance of income level and disposability to the setting of fines and took it into consideration in formulating the guidelines. That having been done, it left no relevance for that factor except insofar as in "atypical case[s]" the court might properly make one of its "highly infrequent" departures. *See* U.S.S.G. § 1A4(b) at 5–6.[6]

If I understand the reasoning of the majority correctly, it starts with the premise that the Commission used a factor unrelated to blameworthiness in determining the guideline range and concludes that sentencing courts are therefore compelled to consider as a ground for departure any other non-blameworthy characteristic attributable to the defendant. The breadth of that leap of logic is succeeded only by the infinite expanse of its consequence, which, so far as I can discern, is without limiting principle. I will discuss that consequence further in part ID of this dissent. In sum, the majority's major premise that we should defer to reasonable interpretations of the Act by the Commission is undeniable. But the syllogism fails at its minor premise. We cannot defer to an interpretation that the Commission never made.

### C. The Result

Not only do I think the majority's reasoning in reaching its conclusion is fundamentally flawed, but I think the result it reaches in this case is utterly indefensible. As the Su-

---

**5.** *See* further discussion in part II of this dissent.

**6.** *E.g.,* a defendant having a nominally low income but extremely low responsibilities and mas-

sive assets might be an atypical case warranting an upward departure.

preme Court has noted, Congress intended that the Sentencing Reform Act would strike against the perceived evil of "great variation among sentences imposed ... upon similarly situated offenders." *Mistretta,* 488 U.S. at 366, 109 S.Ct. at 652. As the Commission, to whom we owe deference, put it, "Congress sought reasonable uniformity in sentencing by narrowing the wide disparity in sentences imposed for similar criminal offenses committed by similar offenders." U.S.S.G. § 1(A)(3). To accomplish this goal, and account for the similarities or lack of similarities in the offense, the Commission constructed the vertical axis of offense conduct described above, computed on the basis of the defendant's crime, adjusted by arguably status-based adjustments and victim-related factors in Chapter 3. *See* U.S.S.G. §§ 3(A) (Victim–Related Adjustments); 3(B) (Role in the Offense); 3(C) (Obstruction); 3(D) (Multiple Counts); 3(E) (Acceptance of Responsibility).

Beyond the arguably "status related" but actually "conduct determined" adjustments set forth in §§ 3(B), (C) & (E), offender characteristics come into play in the computation of the horizontal axis, "Criminal History Category (Criminal History Points)." *See* U.S.S.G. Ch. 4. The only two principal determinants of that axis are Criminal History, U.S.S.G. Ch. 4, Pt. A, and *Career Offenders and Criminal Livelihood,* U.S.S.G. Ch. 4, Pt. B. These take account of the second area of similarity considered in the congressional goal as defined by the Commission: namely, that when offenses are similar, there may be relevant dissimilarities between offenders. As is obvious from the titles of Parts A and B of Chapter 4, the measures of similarity that the Commission deemed relevant are those concerned with the past criminal history or level of present criminal activity of the offender. Thus, the greater the history and the greater the criminal activity, the higher the offender level and the greater the sentences within the applicable range.

Against this logical system of sentencing, my colleagues issue a decision which estab-

lishes the following as the law of this circuit: (a) Defendants Jones and Smith plead guilty to identical criminal offenses; (b) the two defendants have identical histories except that Smith has engaged in more illegal activity than Jones; (c) the sentencing judge has committed reversible error if she holds that she cannot depart from the guideline system to give a *lesser* sentence to Smith than the one which she is required by law to give to Jones. This is not a hypothetical extension of today's decision; this *is* today's decision. The majority holds that the fact that Smith has entered the country illegally in violation of 8 U.S.C. § 1181 *et seq.* lawfully entitles him to consideration for a lesser sentence than an otherwise identically-situated offender who has not engaged in that same additional illegal activity. I submit that this result is totally inconsistent with the sentencing structure mandated by Congress and designed by the Commission.

### D. The Precedent

So far as I can tell, today's decision is precedent for the proposition that when any defendant advances virtually any purported reason why a sentencing judge should depart downward from the range determined under the guidelines, almost without exception, the district judge has committed reversible error if she says that she cannot do so. I have searched the majority opinion for some limitation on the possible grounds of departure and have found only the recognition that the Commission has completely taken out of the departure universe the suspect categories of race, sex, national origin, creed, and religion, as well as socioeconomic status, lack of guidance as a youth and similar circumstances, drug dependence and alcohol abuse and personal financial difficulties. Maj. op. at 654 (citing §§ 5H1.10, 5H1.12, 5H1.4 & 5K2.12). Beyond that, I do not find in the majority opinion any logical stopping point.

The majority expressly disavows any thought that mitigating circumstances must be related to the culpability (or "moral blameworthiness") of the offender.[7] It does

---

7. The majority relies on *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), as support for its conclusion that "mitigating cir-

cumstances" may include factors unrelated to moral blameworthiness, noting that in *Lockett,* "the Supreme Court treated 'mitigating' as a

not offer any defining substitute. I am, in fact, uncertain as to why the majority believes that being an illegal alien falls within the category of mitigating circumstances. So far as I can determine, that conclusion is based on the defendant's assertion that if he is sentenced equally with American citizens, that sentence will fall more heavily upon him because he is to be deported and will not be able to serve the last few months of his sentence in a reduced custody facility as he asserts would be the case with otherwise similarly situated American citizen offenders.[8] *See* Maj. op. at 651 (citing Security Designation and Custody Classification Manual, Ch. 2–9 (June 15, 1992)). However, I do not understand my colleagues to be saying that mitigating circumstances are limited to factors that cause punishment to fall more heavily upon one defendant than upon others. Rather, I understand them to be positing that more burdensome confinement conditions are a subset of mitigating circumstances which the sentencing judge must consider or commit reversible error. But even if the majority takes the former tack, and offers more burdensome confinement conditions as its limiting principle, I fail to see

how that imposes any real limit. Rare, if not nonexistent, would be the defendant who could not personally (or through counsel) think of some reason why punishment might fall more heavily upon him than upon the general category of offenders in which he otherwise falls. Indeed, under the precedent set by this opinion, I would think it almost a *prima facie* case of malpractice if a defense attorney did not come up with at least one such reason. In the days before the guidelines, when judges were free under most sentencing regimes to impose any sentences below the statutory maximum as they saw fit, almost every defense attorney offered some such reasoning. After today, they will again.

At oral argument, my colleagues thought it ingenious of me to suggest that a defense attorney representing an older offender would assert that, given his lesser life expectancy, a term of years would fall heavier upon him than on other defendants; I did not think so. At the risk of being excessively autobiographical, I spent a major fraction of my professional time from 1970 until November of 1987 (less than a month after the effective date of the guidelines) in the crimi-

---

very broad term, requiring that juries in death cases be allowed to consider, '*as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.'" Maj. op. at 652–53 (quoting *Lockett*, 438 U.S. at 604, 98 S.Ct. at 2965). From *Lockett*'s broad use of the word "mitigating," the majority concludes that a broad construction is also compelled in this case.

*Lockett*, written six years before the enactment of the Act, obviously did not address the proper interpretation of the term "mitigating circumstances" as used in 18 U.S.C. § 3553(b). In fact, *Lockett* did not purport to construe the term "mitigating circumstances" as used in *any* congressional statute. Rather, *Lockett* dealt with a very different question than that presented here—whether Ohio's mandatory death penalty statute could withstand constitutional scrutiny. The Court held that it could not, reasoning that the "fundamental respect for humanity underlying the Eighth Amendment ... requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." *Id.* (alteration in original) (internal quotation deleted). The Court was careful to warn, however, that its decision was based solely on constitutional concerns and was to be applied

only in capital cases. *See id.* at 604–05, 98 S.Ct. at 2965 ("We recognize that, in noncapital cases, the established practice of individualized sentences rests not on constitutional commands, but on public policy enacted into statutes."); *id.* at 605 n. 13, 98 S.Ct. at 2965 n. 13 ("We emphasize that in dealing with standards for imposition of the death sentence we intimate no view regarding the authority of a State or of the Congress to fix mandatory, minimum sentences for noncapital crimes."). Charitably put then, *Lockett*'s use of the adjective "mitigating" to describe the circumstances the Constitution requires juries to consider in death penalty cases provides slim support for the majority's interpretation of that term as used in § 3553(b).

**8.** It is not apparent to me that all United States citizens have the same eligibility for community correction center confinement, or that all illegal aliens are required to have the same level of security confinement, or that legal aliens are not also treated as deportable after they have been convicted of a felony and housed in facilities of the same security level as the offender who is an illegal alien *ab initio*. Therefore, it would seem that under the majority's rationale, unless an offender falls into whichever of these categories is the least subject to secure confinement, there is always a "mitigating circumstance" directly parallelling the one in the present case.

nal trial courts. I heard fully dozens of defense attorneys make variations on that argument, often stated as "at my client's age, five years is a life sentence, Your Honor." After today, those arguments will be heard again, and unless the sentencing judge considers them, on the record, she has committed reversible error.

This result applies despite the Commission's decision expressed in § 5H1.1 that "age (including youth) is not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range." Ironically, the majority's decision that the status of being an illegal alien is a mitigating circumstance depends on its belief that this very statement, of no ordinary relevance, was a deference-worthy Commission decision that such a characteristic must be considered by district judges in sentencing.[9]

If the defendant is not old, then surely the defense attorney can argue that either his educational and vocational skills will make it harder for him to cope in prison than others similarly situated; or his mental, emotional, or physical condition will make the period of imprisonment fall harder upon him; or that his employment record is such that not being able to work will fall more heavily upon him than others who have no such record; or that his family ties, responsibilities and community ties will make severance from them harder on him than upon others; or, conversely, that his lack of such ties will make it harder upon him because there will be nobody to visit him. In short, hereafter, every time a district judge imposes a sentence within the guideline range dictated by law, we may expect an appeal that the district court did not properly consider a mitigating factor, since henceforth some factor about every defendant will be a mitigating circumstance.

I will grant that the district court can head off at least a portion of these appeals simply by saying something like, "I realize that counsel's argument advances something that might be a mitigating circumstance under the rule of *United States v. Smith;* however,

I have considered it and reject it." That done, presumably, the case would then be governed by the rule . of *United States v. Ortez,* 902 F.2d 61, applying 18 U.S.C. § 3742(a)(2). Thus, the decision not to depart downward from an applicable guidelines range would once again be generally unreviewable. I hope that will be the case. But even if we do make once again unreviewable that which Congress intended to be unreviewable under § 3742(a)(2), it would be only at the expense of one more duty on an already overburdened district court, and the spectacle of one more required rote recitation in every case, fulfilling no legitimate expectation of anyone.

However, I am not certain that the district court would be able to head off the appeal so easily. Today's decision, having established that the district court must consider virtually anything that the defendant wishes to offer as a basis for downward departure before sentencing within the legally dictated guideline range, would appear to presage a series of cases determining just what is enough record evidence of consideration. So far as I can tell from the present state of sentencing law (specifically, the reviewability terms of 18 U.S.C. § 3742(a)(2) and the decisions of this court in *Ortez* and *Hazel* ), a mere statement by the district judge that she might have the power to depart on that basis would be enough to preclude appellate review. Again, I hope that would be the case. However, before today's decision I would have thought the present record to have been sufficient to ward off such an appeal, so perhaps I will be wrong again.

### E. The Record

All that said, I am not at all convinced that the majority's construction of the district judge's words in the present record is correct. That is, I am not certain that she even meant to decide that the status of illegal alien could not lawfully be considered as a mitigating circumstance. The majority states that "the court, though expressing a

---

9. At least that is how I read my colleagues' reliance upon the Commission's handling of age and the other "status factors" listed in § 5H1.1, *et seq.* If that is not what they intend, then I have no idea what they meant by relying on those sections in the deference portion of the majority opinion.

desire to reduce [Smith's] sentence," found no ground for departure. Maj. op. at 650. However, it appears to me that if all that means is that the district court found "no ground for departure," then the sentence is unreviewable.

As I have already noted, 18 U.S.C. § 3742(a)(2) dictates that "decisions not to depart downward from an applicable guidelines range" are generally unreviewable. *Ortez*, 902 F.2d at 63. What I think the majority is saying is that the district judge held that the status of illegal alienage could not lawfully be a ground for departure, and that her holding was erroneous, so as to make her decision appealable under 18 U.S.C. § 3742(a)(2) as "a misapplication of the guidelines." *Hazel*, 928 F.2d at 423. In fact, what the sentencing judge said on the record was, "I wish, really and truly that I could reduce, but I really don't see any basis for departure." While the majority's interpretation of the district court's words is a possible one, I do not think it the only one, or even the most likely.

Again, committing what is perhaps a cardinal sin for an appellate judge (but one easy to commit in dissent), I recall my own experience in the trial courts. In the days before guideline sentencing, after having heard all the pleas for probation or leniency, a sentencing judge—including the one writing this dissent—typically said something like, "Counsel, I'd like to give your client a lenient sentence, but I just can't see any basis for it." Each of us knew that lawfully we could give a lighter sentence. We did not mean by that phraseology to indicate that a lighter sentence was unlawful; we meant simply that we could not on the facts, or in good conscience, enter the more lenient sentences that attorneys were always requesting. I suggest at least the possibility that this is what the district court was doing here, and I further suggest that absent clearer error than this record reveals, even if my colleagues were correct about what constitutes a mitigating circumstance, this judgment should still not be reversed.

To reverse on this record is to ignore circuit law on the applicable standard of review for a district court's application of the guidelines to the facts. Even in the determination of statutory enhancements, such as whether certain conduct constitutes obstruction of justice under § 3C1.1, or more than minimal planning under § 2F1.1(b)(2)(A), we apply a deferential "clearly erroneous" standard of review to a district court's decision under 18 U.S.C. § 3742(e). We are directed by statute to apply that clearly erroneous standard to the district court's finding of facts on sentencing, and to "give due deference to the district court's application of the guidelines to the facts." *Id.* (emphasis added). In *United States v. Kim*, 23 F.3d 513, 517 (D.C.Cir.1994), we made clear that this "'[d]ue deference' presumably is meant to fall somewhere between *de novo* and 'clearly erroneous.'" Today's determination, that a district court commits a reversible error by holding that a personal factor created by the defendant's own misconduct is not a basis for departure, seems to me to show no deference at all.

## II. WHAT ARE "MITIGATING CIRCUMSTANCES"?

I have asserted that the majority's decision that status as an illegal alien can constitute a mitigating circumstance is based on a flawed understanding of the concept of mitigating circumstances, and that the decision to reverse the district court based on that erroneous understanding is incorrect. Some might therefore challenge me to produce my own (correct) understanding as to what is included within the term "mitigating circumstances" as used in 18 U.S.C. § 3553(b). At the risk of being accused of ducking a question, I do not think the court is called upon today to decide what can be a mitigating circumstance. We must decide only whether this district court erred in determining that illegal alienage could not be such a circumstance (assuming for sake of argument that she made that determination).

Sweeping pronouncements on what *could* be mitigating circumstances would be only *dicta*. For a dissent to express such sweeping pronouncements would be less than *dicta*. Accordingly, I yield to the temptation of expressing some rudimentary thoughts on that subject, but only to the extent of clarify-

ing why I place Smith's alien status outside the category of mitigating circumstances. I do so with the understanding that a dissenter is not empowered to set precedent as to what can fall within. In that vein, I offer these thoughts as to what defining principles sentencing judges might employ in determining whether departure is warranted, in order to demonstrate that the status of illegal alienage is not a proper basis for departure.

First, I would look to the text of the statute. Congress has required the trial court to impose a sentence within the guideline range "unless the court finds ... an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission...." 18 U.S.C. § 3553(b). I would thus begin my analysis with the understanding that Congress used "aggravating" and "mitigating" in their ordinary and antonymous meanings. I recognize that Congress may have "intended to define a mitigating circumstance narrowly as one that reduces a defendant's moral culpability or more broadly to include all relevant circumstances including a reduced need to punish." *United States v. Mason*, 966 F.2d 1488, 1495–96 (D.C.Cir.1992). However, where the two terms are juxtaposed as they are here, I think it reasonable to conclude that Congress more likely intended the former rather than the latter interpretation. I do not think we would be inclined to uphold a district judge who held that aggravating circumstances included the fact that a defendant who was, for example, a boxing champion, would not be as severely punished by a sentence within the guideline range as his tenderer fellows, and therefore increased his time behind bars. That being the case, I think the more likely meaning is the first interpretation suggested by *Mason*—specifically, that Congress intended both mitigating and aggravating circumstances to encompass factors that reduce or expand the defendant's moral culpability. Having chosen the narrower of the two *Mason* alternatives, I would give that alternative a rather broad construction to comport with what I think is the next step of analysis. That is, having examined the statute, I would then look to see what the Sentencing Com-

mission has to say about mitigating circumstances.

The Commission, in the introductory section of its guidelines manual, gives the courts a helpful discussion of departures. *See* § 1A.4(b). It tells us that departure should occur "[w]hen a court finds an atypical case ... to which a particular guideline linguistically applies but where conduct significantly differs from the norm...." U.S.S.G. § 1A.4(b) at 5–6. The Commission further reminded us that specific sections of the guidelines, in obedience to the mandate of 28 U.S.C. § 994(d), deemed certain characteristics irrelevant to sentencing and expressly took them off the table for all purposes, including departure. *See id.* at 6 (citing § 5H1.10 (race, sex, national origin, creed, religion, and socioeconomic status); § 5H1.12 (lack of guidance as a youth and similar circumstances); § 5H1.4, third sentence (physical condition, including drug dependence and alcohol abuse); § 5K2.12, last sentence (economic hardship, personal financial difficulties, and economic pressures upon a trade or business)). Beyond that, the Commission expressly decried any intent to "limit the kinds of factors ... that could constitute grounds for departure in an *unusual* case." *Id.* (emphasis added).

Next, the Commission expressed the view "that despite the courts' legal freedom to depart from the guidelines, they will not do so very often." *Id.* Particularly, the Commission envisioned that the courts' exercise of that legal freedom would occur only in "*rare* occurrences" that would constitute "*unusual* cases outside the range of the more typical offenses for which the guidelines were designed." *Id.* (emphasis added).

The Commission further explained that there are two different kinds of departure. "The first involves instances in which the guidelines provide specific guidance for departure by analogy or by other numerical or non-numerical suggestions." *Id.* The Commission has illustrated this kind of departure in the commentary to § 2G1.1 (the section governing prostitution or prohibitive sexual conduct) which expressly recommends a downward departure of eight levels where a commercial purpose was not involved. *Id.*

Further examples of this sort of departure, and the kind of guidance the Commission does offer us for making guideline determinations, are mentioned in the majority opinion. Maj. op. at 652–54. Part K of Chapter 5 of the guidelines is entitled "Departures" and provides guidance to the courts for that step of the sentencing process. Section 5K1 is entitled "Substantial Assistance to Authorities." In § 5K1.1, the Commission expressly determined that "where a defendant has provided substantial assistance" to the prosecution, "the court may depart from the guidelines" upon motion of the government. Section 5K1.2 declares that the court may not consider refusal to assist authorities as an aggravating sentencing factor. Section 5K2, in its several subsections, deals with several other potential aggravating or mitigating circumstances and suggests whether the sentencing court "may impose a sentence outside" the guideline range. Without exception, none of the suggested grounds for departure deals with status of the defendant. Each deals with the punishment-worthiness of the act—either because of the culpability of the defendant, or the severity of the consequences of his acts.

I understand but reject the majority's categorization of certain of the listed aggravators as "moral luck"—that is, the fact that the conduct resulted in death, § 5K2.1, physical injury, § 5K2.2, extreme psychological injury, § 5K2.3, or property damage or loss, § 5K2.5. It is just this sort of "moral luck" that has always determined the extent of society's retributive interest in punishment of criminal conduct. Society has always punished murder more severely than a similar assault upon a person that did not result in death. The law has generally punished assaults resulting in serious bodily injury more severely than those that did not result in serious bodily injury; theft of high-valued property (*e.g.*, grand larceny) more severely than thefts of low-valued property (*e.g.*, petit larceny); and trespasses resulting in damage to the victim's property more severely than trespasses that were solely invasions of the property rights of the victim. To treat these similar factors as aggravating factors in a punishment scheme is neither surprising nor an invitation to consider chosen personal characteristics of a defendant as the majority does today.

Furthermore, there is particular relevance to the Commission's deference-worthy determinations in § 5H1.4, taken in conjunction with Chapter 1, Part A of the guidelines. The Policy Statement for § 5H1.4 (Physical Condition, Including Drug or Alcohol Dependence or Abuse), employs the usual language of the subsections under § 5H1, stating that "physical condition or appearance ... is not ordinarily relevant" in deciding whether to depart. It then makes exception for "*extraordinary* physical impairment" (emphasis added), which "may be a reason" to depart downward. *See* U.S.S.G. § 5H1.4. But then, most tellingly, it informs us in the third sentence that "[d]rug or alcohol dependence or abuse is not a reason for imposing a sentence below the guidelines." *See id.*

Based upon this policy statement, the Commission in the introductory chapter describes "[p]hysical [c]ondition, [i]ncluding [d]rug [d]ependence and [a]lcohol [a]buse," as one of the factors that "the court *cannot* take into account as grounds for departure." *See* U.S.S.G. § 1A.4 (emphasis added). That is, the Commission recognizes that within those categories it has deemed "not ordinarily relevant" in making the departure decision, such as "physical condition," the nondeparture mandate of the third sentence of § 5H1.4 is the norm, not the departure possible under the second sentence. The Introduction does not simply say "drug or alcohol dependence" is a forbidden ground; it expressly says *physical condition,* including drug or alcohol dependence is not a proper ground for departure. *See id.* (citing U.S.S.G. § 5H1.4, sentence three).

Not only is this instructive as to the Commission's general interpretation of mitigating circumstances, I suggest that if the majority is correct in believing that the "status" of illegal presence in the United States is analogous to factors considered by the Commission, then the one listed in the third sentence of § 5H1.4 is the most analogous. If illegal presence is a status, then it is not a status like age or slight physical stature, brought about through no fault of the defendant's

own. It is rather a status assumed by the defendant's own voluntary conduct, not unlike drug or alcohol dependence or abuse, brought about by the defendant's engaging in the use and abuse of these substances. Since the Commission has directed that those conduct-based "statuses" are not "reason[s] for imposing a sentence below the guidelines," neither, I think, should we compel district judges to consider as a mitigator the status of illegal alienage, which was brought about by the defendant's own illegal conduct. The Commission in the policy statement at § 5H1.4, explaining the third sentence, notes that "substance abuse is highly correlated to an increased propensity to commit crime." Since the status of illegal alien is attained only by those who are committing an illegal act, then again I suggest that the conduct-based status described in § 5H1.4 is the nearest parallel.

To the extent that the Commission's express determinations on the general irrelevance of age and the other characteristics listed above considered in guidelines § 5H1 instruct us at all, they instruct us away from the result reached by the majority. In the case of age, after including the usual "not ordinarily relevant" caveat, the Commission expressly said it could be relevant only at one extreme. U.S.S.G. § 5H1.1 ("Age may be a reason to impose a sentence below the applicable guideline range when the defendant is elderly and infirm. . . ."). Insofar as the Commission stated as to each of the other characteristics that they were "not *ordinarily* relevant" in determining whether to depart from the guideline range, this suggests that a factor warranting departure should be an *extraordinary* one. But, being an illegal alien engaged in criminal activity is not extraordinary. According to one source, Immigration and Naturalization Service officials have "estimated that 3.2 million illegal immigrants were in the United States in October 1992, and estimates of new illegals range from 300,000 to 500,000 annually." Charles W. Hall & Steve Bates, *Illegal Immigrants Pose Issues of Cost, Conscience for Area*, WASHINGTON POST, Apr. 25, 1994, at A1k. *Accord, Return of the Huddled Masses*, THE ECONOMIST, May 7, 1994, at 25 ("300,000 or so illegal immigrants arrive in the United States each year."). Federal, state and local prisons regularly host a large number of these individuals during their stays in this country. *See, e.g.,* John Makeig, *More than 10,000 Immigrants Jailed Here in 1993*, HOUSTON CHRONICLE, May 24, 1994, at 16 (approximately 2,500 illegal immigrants accused of felony crimes housed in Texas prisons); Daniel M. Weintraub, *Wilson to Sue on Inmate Immigrants*, LOS ANGELES TIMES, Apr. 26, 1994, at A3 (16,700 illegal immigrants convicted of felonies incarcerated in California jails).

It may well be for this reason that every circuit court of appeals to address the issue has determined that the collateral consequences that may attach to one's "status" as a deportable alien, including ineligibility for less restrictive terms of confinement, cannot justify a downward departure from the applicable sentencing guidelines range. *See United States v. Mendoza–Lopez*, 7 F.3d 1483, 1486 (10th Cir.1993) (allegedly "harsh consequences of imprisonment for deportable aliens" are not grounds for downward departure); *United States v. Nnanna*, 7 F.3d 420, 422 (5th Cir.1993) ("Collateral consequences, such as the likelihood of deportation or ineligibility for more lenient conditions of imprisonment, that an alien may incur following a federal conviction are not a basis for downward departure."); *United States v. Alvarez–Cardenas*, 902 F.2d 734 (9th Cir.1990) (alienage cannot be grounds for departure because status as a deportable alien does not lessen severity of the crime or defendant's culpability therefor). Even the Second Circuit, whose *Lara* decision informs the majority's belief that conditions unrelated to culpability can be "mitigating circumstances" within the meaning of 18 U.S.C. § 3553, has rejected the proposition that an illegal alien's inability to serve his time in a minimum security prison or halfway house can serve as the basis for a downward departure because these consequences are not "extraordinary in nature or degree." *United States v. Restrepo*, 999 F.2d 640, 644–45 (2d Cir.1993).

In short, the statute and the Commission's interpretation of it teach us that whatever it takes to constitute an aggravating or mitigating factor, the factor must be atypical, must

occur only in unusual cases, and must generally be related to the punishment-worthiness of the offense involved, whether for reasons tied to moral culpability or retribution-supportive consequence. Since the status of being an illegal alien, otherwise described as the *conduct* of entering or remaining in the United States illegally, does not fit that description, I would conclude that, if the district judge in fact determined that she did not have the authority to depart on that basis, then she was correct in that determination.

Therefore, I respectfully dissent.

# APPENDIX
## SENTENCING TABLE
(in months of imprisonment)

| | Criminal History Category (Criminal History Points) | | | | | |
|---|---|---|---|---|---|---|
| Offense Level | I (0 or 1) | II (2 or 3) | III (4, 5, 6) | IV (7, 8, 9) | V (10, 11, 12) | VI (13 or more) |
| **Zone A** 1 | 0 - 6 | 0 - 6 | 0 - 6 | 0 - 6 | 0 - 6 | 0 - 6 |
| 2 | 0 - 6 | 0 - 6 | 0 - 6 | 0 - 6 | 0 - 6 | 1 - 7 |
| 3 | 0 - 6 | 0 - 6 | 0 - 6 | 0 - 6 | 2 - 8 | 3 - 9 |
| 4 | 0 - 6 | 0 - 6 | 0 - 6 | 2 - 8 | 4 - 10 | 6 - 12 |
| 5 | 0 - 6 | 0 - 6 | 1 - 7 | 4 - 10 | 6 - 12 | 9 - 15 |
| 6 | 0 - 6 | 1 - 7 | 2 - 8 | 6 - 12 | 9 - 15 | 12 - 18 |
| 7 | 0 - 6 | 2 - 8 | 4 -10 | 8 -14 | 12 - 18 | 15 - 21 |
| 8 | 0 - 6 | 4 - 10 | 6 - 12 | 10 - 16 | 15 - 21 | 18 - 24 |
| 9 | 4 - 10 | 6 - 12 | 8 - 14 | 12 - 18 | 18 - 24 | 21 - 27 |
| **Zone B** 10 | 6 - 12 | 8 - 14 | 10 - 16 | 15 - 21 | 21 - 27 | 24 - 30 |
| 11 | 8 - 14 | 10 - 16 | 12 - 18 | 18 - 24 | 24 - 30 | 27 - 33 |
| **Zone C** 12 | 10 - 16 | 12 - 18 | 15 - 21 | 21 - 27 | 27 - 33 | 30 - 37 |
| 13 | 12 - 18 | 15 - 21 | 18 - 24 | 24 - 30 | 30 - 37 | 33 - 41 |
| 14 | 15 - 21 | 18 - 24 | 21 - 27 | 27 - 33 | 33 - 41 | 37 - 46 |
| 15 | 18 - 24 | 21 - 27 | 24 - 30 | 30 - 37 | 37 - 46 | 41 - 51 |
| 16 | 21 - 27 | 24 - 30 | 27 - 33 | 33 - 41 | 41 - 51 | 46 - 57 |
| 17 | 24 - 30 | 27 - 33 | 30 - 37 | 37 - 46 | 46 - 57 | 51 - 63 |
| 18 | 27 - 33 | 30 - 37 | 33 - 41 | 41 - 51 | 51 - 63 | 57 - 71 |
| 19 | 30 - 37 | 33 - 41 | 37 - 46 | 46 - 57 | 57 - 71 | 63 - 78 |
| 20 | 33 - 41 | 37 - 46 | 41 - 51 | 51 - 63 | 63 - 78 | 70 - 87 |
| 21 | 37 - 46 | 41 - 51 | 46 - 57 | 57 - 71 | 70 - 87 | 77 - 96 |
| 22 | 41 - 51 | 46 - 57 | 51 - 63 | 63 - 78 | 77 - 96 | 84 - 105 |
| 23 | 46 - 57 | 51 - 63 | 57 - 71 | 70 - 87 | 84 - 105 | 92 - 115 |
| 24 | 51 - 63 | 57 - 71 | 63 - 78 | 77 - 96 | 92 - 115 | 100 - 125 |
| **Zone D** 25 | 57 - 71 | 63 - 78 | 70 - 87 | 84 - 105 | 100 - 125 | 110 - 137 |
| 26 | 63 - 78 | 70 - 87 | 78 - 97 | 92 - 115 | 110 - 137 | 120 - 150 |
| 27 | 70 - 87 | 78 - 97 | 87 - 108 | 100 - 125 | 120 - 150 | 130 - 162 |
| 28 | 78 - 97 | 87 - 108 | 97 - 121 | 110 - 137 | 130 - 162 | 140 - 175 |
| 29 | 87 - 108 | 97 - 121 | 108 - 135 | 121 - 151 | 140 - 175 | 151 - 188 |
| 30 | 97 - 121 | 108 - 135 | 121 - 151 | 135 - 168 | 151 - 188 | 168 - 210 |
| 31 | 108 - 135 | 121 - 151 | 135 - 168 | 151 - 188 | 168 - 210 | 188 - 235 |
| 32 | 121 - 151 | 135 - 168 | 151 - 188 | 168 - 210 | 188 - 235 | 210 - 262 |
| 33 | 135 - 168 | 151 - 188 | 168 - 210 | 188 - 235 | 210 - 262 | 235 - 293 |
| 34 | 151 - 188 | 168 - 210 | 188 - 235 | 210 - 262 | 235 - 293 | 262 - 327 |
| 35 | 168 - 210 | 188 - 235 | 210 - 262 | 235 - 293 | 262 - 327 | 292 - 365 |
| 36 | 188 - 235 | 210 - 262 | 235 - 293 | 262 - 327 | 292 - 365 | 324 - 405 |
| 37 | 210 - 262 | 235 - 293 | 262 - 327 | 292 - 365 | 324 - 405 | 360 - life |
| 38 | 235 - 293 | 262 - 327 | 292 - 365 | 324 - 405 | 360 - life | 360 - life |
| 39 | 262 - 327 | 292 - 365 | 324 - 405 | 360 - life | 360 - life | 360 - life |
| 40 | 292 - 365 | 324 - 405 | 360 - life | 360 - life | 360 - life | 360 - life |
| 41 | 324 - 405 | 360 - life | 360 - life | 360 - life | 360 - life | 360 - life |
| 42 | 360 - life | 360 - life | 360 - life | 360 - life | 360 - life | 360 - life |
| 43 | life | life | life | life | life | life |

NOVEMBER 1, 1993