**UNITED STATES of America, Appellee,**

v.

**Oscar ANDERSON, Jr., Appellant.**

**Nos. 95–3109, 95–3123.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 29, 1996.

Decided April 16, 1996.

Rehearing and Suggestion for Rehearing In
Banc Denied June 26, 1996.*

* Circuit Judge Wald would grant the petition for     rehearing.

Carmen D. Hernandez, Assistant Federal Public Defender, argued the causes for appellants. With her on the briefs were A.J. Kramer, Federal Public Defender, and Valencia R. Rainey, Assistant Federal Public Defender. Santha Sonenberg, Assistant Federal Public Defender, entered an appearance.

Elizabeth H. Danello, and Chun T. Wright, Assistant United States Attorneys, argued the causes for appellee. With them on the briefs were Eric H. Holder, Jr., United States Attorney, John R. Fisher, Elizabeth Trosman, and Jennifer M. Anderson, Assistant United States Attorneys.

Before: WALD, WILLIAMS and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.

Concurring Opinion filed by Circuit Judge TATEL.

Dissenting Opinion filed by Circuit Judge WALD.

STEPHEN F. WILLIAMS, Circuit Judge:

In establishing minimum mandatory penalties for drug offenses in the Anti–Drug Abuse Act of 1986, Pub.L. No. 99–570, 100 Stat. 3207, Congress adopted a 100:1 ratio as between amounts of cocaine powder and cocaine base, generally known as crack. 21 U.S.C. § 841(a) & (b). The five-year mandatory minimum kicks in, for distribution or possession with intent to distribute, at 500 grams of cocaine powder but at only five grams of crack. 21 U.S.C. § 841(b). The ten-year minimum starts at five kilograms of cocaine or 50 grams of crack. *Id.* In its effort to grade penalties in accordance with the severity of the offense, as measured for drug offenses in part by the quantity of drugs, the Sentencing Commission incorporated the statutory ratio, both for lower and higher quantities. Thus drug convictions involving at least 500 but less than 2000 grams of cocaine, or at least 5 but less than 20

grams of crack, equally produce a base offense level of 26. U.S. Sentencing Guidelines ("U.S.S.G.") § 2D1.1. Absent any further adjustments, this would lead to a sentencing range of 63 months (just above the five-year statutory minimum) to 78 months. *Id.* at Ch. 5, Pt. A. The next quantitative step up, 2-to-3.5 kilograms of cocaine or 20–to–35 grams of crack, would take the offense to level 28 and a range of 78 to 97 months. And so on. The Commission explained that "[t]he base offense levels in § 2D1.1 are either provided directly by the Anti–Drug Abuse Act of 1986 or are proportional to the levels established by statute.... Levels 32 and 26 in the Drug Quantity Table are the distinctions provided by the Anti–Drug Abuse Act; however, further refinement of drug amounts is essential to provide a logical sentencing structure for drug offenses." U.S.S.G. § 2D1.1 (commentary, background).

The 100:1 ratio has been subject to severe attack, particularly because the use and marketing of cocaine powder and crack appear to follow a racial fault line, with blacks being characteristically subject to the far more draconian crack penalties. See, e.g., *United States v. Thompson,* 27 F.3d 671, 678 (D.C.Cir.1994); *United States v. Armstrong,* 48 F.3d 1508, 1511–12, 1515 (9th Cir.), cert. granted, —— U.S. ——, 116 S.Ct. 377, 133 L.Ed.2d 301 (1995). The widespread concern has led to an exchange between Congress and the Sentencing Commission, as yet inconclusive, but which appellants claim establishes that the flaws in the 100:1 ratio amount to a "mitigating circumstance ... not adequately taken into consideration" by the Sentencing Commission, thereby authorizing a departure under 18 U.S.C. § 3553(b) below the otherwise indicated Guidelines range.

In the Omnibus Violent Crime Control and Law Enforcement Act of 1994, Congress directed the Commission to produce a report on the difference in penalty levels, along with any recommendations for change. Pub.L. No. 103–322, § 280006, 108 Stat. 2097. The Commission duly produced a report that— after reviewing the varieties of cocaine, examining the health effects of their use, describing how they are distributed, and at-

tempting to measure their effect on crime—concluded, rather hesitantly and cautiously, that "a policymaker could infer that crack cocaine poses greater harms to society than does powder cocaine." Special Report to the Congress: Cocaine and Federal Sentencing Policy 195 (Feb. 1995). But the Commission concluded that the 100:1 ratio was not logically supportable. Some of the concerns that had led to its adoption by Congress, such as the greater association with gun-carrying, violence, and offenders' prior criminal records, were the subject of enhancements under the Guidelines, making it inappropriate to use them also as a basis for greater severity for crack across the board. *Id.* at 196. Other concerns, however, such as crack's greater addictiveness and (because of its cheapness) availability to "a broader and more vulnerable part of the population," *id.* at 197, were not separate bases for adjustment, and accordingly remained grounds for some differential. Thus, although the Commission "strongly" recommended against retention of the 100:1 ratio, it declined to recommend any particular alternative. *Id.* at 198. In May 1995, however, the Commission bit the bullet and proposed a 1:1 ratio, also specifically suggesting that Congress drop the 100:1 ratio from its own mandatory minimums. See United States Sentencing Commission, Amendments to the Sentencing Guidelines for United States Courts, 60 Fed.Reg. 25074, 25075–76 (1995).[1] Congress rejected the 1:1 ratio proposal on October 30, 1995, Pub.L. 104–38, § 1, 109 Stat. 334, but at the same time told the Commission to try again, with the guidance (rather obvious under the circumstances) that "the sentence imposed for trafficking in a quantity of crack cocaine should generally exceed the sentence imposed for trafficking in a like quantity of powder cocaine...." *Id.* § 2(a)(1)(A).

Both appellants here pleaded guilty to offenses involving at least five but less than 20 grams of crack, leading to initial classification of their offenses at level 26. Both calculations were subject to further adjustments that are not in dispute here, so that, even though they were sentenced at the very bottom of their Guidelines range, both received sentences well above the five-year mandatory minimum; thus, despite Congress's retention of the 100:1 ratio in those minimums, for them a downward departure would have been feasible (i.e., would not have bumped into the mandatory floor) if it had been permissible under the Guidelines. Both were sentenced after the Commission made its 1:1 proposal to Congress but before the congressional rejection, and both asked the district judge (the same one, as it happened) to depart downwards on the theory that the Commission's report and recommendation proved the inadequacy of the Commission's prior "consideration" of the cocaine-crack relationship. The district court declined, expressly stating that it lacked authority, and reasoning that the proposed amendment was "not a law" but "just a recommendation to Congress." We agree that the Commission's and Congress's ongoing and inchoate efforts to alter the status quo do not give district Judges authority to depart.

\* \* \*

District courts have statutory authority to depart from sentencing levels established in the Guidelines if

the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.

18 U.S.C. § 3553(b); see also U.S.S.G. § 5K2.0 (policy statement). We reject the

---

1. The Commission did make an effort to explain why its former conclusion about crack's greater addictiveness—a factor not captured in the Guidelines apart from the ratio—did not justify a sentencing disparity: because, although powder cocaine cannot be smoked and is usually taken by the less addictive method of snorting, "powder cocaine may be injected and injection is even more likely to lead to addiction than is smoking." 60 Fed.Reg. at 25077. But the Commission dismissed another factor not captured elsewhere in the Guidelines, crack's comparative cheapness, simply by saying: "Nor does the fact that crack cocaine is typically sold in smaller amounts, which may make it more readily available among lower-income groups, justify increased punishment compared to a form of the drug that is more commonly sold in amounts available only to more affluent persons." *Id.*

appellants' contention that the Commission's Special Report and later recommendation to Congress show that it did not "adequately" consider the cocaine-crack issue when it adopted the 100:1 ratio, as the term "adequately" is used in § 3553(b).

We question whether one could read "adequately" as used in § 3553(b) to permit courts to find the Commission's "consideration" of a factor inadequate unless the Commission has not officially considered the factor at all—"circumstances of a kind"—or has not addressed the *extremity* of the case—"or to a degree." In its statement of purposes for establishment of the guidelines and the Commission, interestingly, Congress in fact used a formula omitting the word "adequately" altogether, saying that its goal was to avoid sentencing disparities "while maintaining sufficient flexibility to permit individualized sentences when warranted by mitigating or aggravating factors not taken into account in the establishment of general sentencing practices." 28 U.S.C. § 991(b)(1)(B).

In any event the Commission has explained that it intends the district courts to "treat each guideline as carving out a 'heartland,' a set of typical cases embodying the conduct that each guideline describes," and to consider departing only if the court "finds an *atypical case*, one to which a particular guideline linguistically applies but where *conduct significantly differs from the norm*." U.S.S.G. Ch. 1, Pt. A, § 4(b) (policy statement) (emphasis added); see also *United States v. Dyce*, 78 F.3d 610, 612 (D.C.Cir. 1996) (explaining atypicality requirement). This interpretation is an entirely reasonable reading of the statute. See *United States v. Doe*, 934 F.2d 353, 359 (D.C.Cir.1991) (courts defer to reasonable interpretations by Sentencing Commission under *Chevron, U.S.A. v. NRDC*, 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984)); cf.

*Williams v. United States*, 503 U.S. 193, 201, 112 S.Ct. 1112, 1119, 117 L.Ed.2d 341 (1992) (policy statements limiting district court discretion to depart are "authoritative guide[s]" to meaning of Guidelines).[2] In *United States v. Rivera*, 994 F.2d 942 (1st Cir.1993), then-Chief Judge Breyer elaborated on the link between atypicality and the definition of "kind" and "degree":

> The district court's decision that circumstances are of a "kind" or "degree" that warrant departure will *not* involve a "quintessentially legal" interpretation of the words of a guideline, but rather will amount to a judgment about whether the given circumstances, as seen from the district court's unique vantage point, are *usual or unusual, ordinary or not ordinary,* and to what extent.

*Id.* at 951 (emphasis added). This reading assures fulfillment of the Guidelines' effort to structure sentencing coherently. Non-Guidelines sentences will occur only where the Commission has completely overlooked a factor (an event that is presumably rare and almost inconceivable for a characteristic typical of a crime or of defendants) or where the defendant's case manifests a circumstance that was considered but which is present in such an extreme form that the Guidelines' adjustment for it is inadequate.

Appellants cite *United States v. Smith*, 27 F.3d 649 (D.C.Cir.1994), to prove the absence of any atypicality requirement. But in that case, holding that a downward departure was permissible where defendant would serve his sentence under harsher conditions solely because he was a deportable alien, neither the majority nor the dissent could find any suggestion that the Commission had considered that circumstance *at all* in establishing the Guidelines. (Although the Commission's complete lack of consideration was not men-

**2.** As the Dissent observes, the Court in *Stinson v. United States*, 508 U.S. 36, 44–45, 113 S.Ct. 1913, 1918–19, 123 L.Ed.2d 598 (1993), said that commentary should be treated as an agency's interpretation of its own legislative rule, see Dissent at 2–3, which is more deferential than *Chevron* review, see *Stinson*, 508 U.S. at 44, 113 S.Ct. at 1918. But *Stinson* involved commentary on a *guideline*, as the Court stressed, *id.* at 42–43, 113 S.Ct. at 1917–18, whereas the key policy statement embodying the atypicality requirement, U.S.S.G. Ch. 1, Pt. A, § 4(b), is an interpretation of a *statute*, 18 U.S.C. § 3553(b), so it is not clear why greater-than-*Chevron* deference would be suitable under the principles of *Stinson*. In any event, the point is clearly not critical here, as the Dissent, asserting a greater level of deference than we do, finds the Commission's view not worthy of deference as applied to this set of facts.

tioned explicitly, it is clear from the discussions in the opinions.) Nor can it be said that an expectation of especially severe conditions of incarceration due to being a deportable alien is typical of defendants. Our more recent decision in *Dyce* emphasizes the other form of inadequate consideration—a factor manifest in an extreme degree in the defendant's case. There we rejected the district court's grant of a downward departure for family responsibilities to a single mother of three, pointing out that the Guidelines discourage consideration of family circumstances in sentencing and that such consideration therefore was allowed only in an "extraordinary" situation, which Dyce did not present. *Dyce,* 78 F.3d at 613.

In their briefs appellants try to get around these limitations on the meaning of adequate consideration by stressing that the Commission *itself* found that its earlier decision failed to take adequate account of the (lack of) differences between powder cocaine and crack. But 18 U.S.C. § 3553(b) states: "In determining whether a circumstance was adequately taken into account, the court shall consider only the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission." As the Commission has not so characterized its report and recommendation to Congress on crack, they would seem to have no more weight for these purposes than a report by a learned society.[3] There is no logical distinction between them for purposes of measuring adequacy of consideration; indeed, at oral argument counsel urged that a report of the latter sort would equivalently undermine the adequacy of the Commission's consideration of an issue. The Commission presented new findings, as any group or individual might do, that it claimed undermined the policy basis for part of the Guidelines. But it refrained from any effort to assign the report and recommendations official status under § 3553(b)—to do so would have been to engage in rather vehement self-contradiction—and merely proposed an amendment to Congress. Because

Congress rejected it, the proposal never moved from astute critique into the realm of legal effectiveness.

Insofar as appellants try to escape this reasoning, they argue that Congress didn't just reject the proposal, it invited the Commission to reconsider and to come up with an alternative. But a direction to study a matter, even from Congress, cannot be said to change the state of the *law* (here, the legal fact that the Commission has considered the "circumstance"—the difference between crack and powder cocaine). If it could, then directions to study, which often accompany legislation, see, e.g., Natural Gas Policy Act, Pub.L. No. 95–621, § 123, 92 Stat. 3350, 3371 (1978) (calling for Department of Energy to produce reports on "competitive conditions and market forces in the natural gas industry in the United States"), might be deemed to change the interpretation of the statute to which they are ancillary—and evidently to change it in completely random ways, in accordance with whatever the interpreting judge might expect to flow from the study.

Acceptance of appellants' argument would logically allow every sentencing district judge to select his or her personal crack-cocaine ratio, at any level between 100:1 (by denying departure) and 1:1. It is hard to imagine a more flagrant violation of the Guidelines' purpose to avoid "unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct." 28 U.S.C. § 991(b)(1)(B); see also *United States v. Williams,* 980 F.2d 1463, 1467 (D.C.Cir.1992) ("The very purpose of the Guidelines ... was to eliminate disparity in the sentences of similarly situated defendants.").

Apart from those disparities, appellants' theory would greatly exacerbate a problem that the mandatory minimums already entail. A defendant guilty of distributing exactly five grams of crack, and whose treatment under the Guidelines calls for no upward adjustment, *must* get a minimum of five years. 21

---

**3.** Section 3553(b) is not entirely clear as to how a court is to determine from the specified documents "whether a circumstance was adequately taken into account." Although § 3553(b) instructs courts to consider only guidelines, policy statements, and official commentary to determine whether the Commission adequately took into account a factor, it does not specify how or against what courts are to *measure* the adequacy of the Commission's consideration of a factor.

U.S.C. § 841(b). Under appellants' view, a defendant guilty of the same crime, but with a host of aggravating factors, could readily get exactly the same sentence. Similar distortions are possible even now. A defendant with a base offense level equal to a mandatory minimum, plus some mitigating circumstances, can get no benefit from the latter, whereas a similar crack defendant, with the same mitigating circumstances and a host of aggravating ones, can do so—he can have the former offset the latter. Because acceptance of defendants' claim here would greatly expand the incidence of these distortions, it is significant that the Commission's reform proposal included an explicit invitation to Congress to change the mandatory minimums themselves. It is thus unclear whether the Commission has even favored (we know it has not enacted) a crack/cocaine ratio for the Guidelines out of sync with that of the statute. So far as appears, it has not altered its original view that "a logical sentencing for drug offenses" requires refinements coordinated with the mandatory minimums. U.S.S.G. § 2D1.1 (commentary, background).

Insofar as Hogan makes any separate argument (which his counsel disclaimed at oral argument), it runs roughly as follows: In the commission of my offense I did not engage at all in certain aggravating conduct (e.g., causing death or injury, possession or use of weapons, or sales of drugs to juveniles) that the Commission has (1) specifically identified as appropriate grounds for upward adjustments and (2) used in its crack report as part of the explanation for its adoption of the 100:1 ratio for crack. In other words, the Commission double-counted by considering the same factors in setting both the base offense level and upward adjustments. Accordingly, he implicitly argues, it is appropriate in context to treat the *absence* of these factors in his case as special mitigating circumstances "not adequately taken into consideration" by the Commission.

The difficulty with Hogan's position is that it underscores why the Commission as a realistic matter could not classify its crack report and recommendations among the official materials to be considered under § 3553(b). To do so would have been to render those official materials hopelessly self-contradictory, saying on the one hand that crack deserves truly draconian treatment because of its *statistical association* with special characteristics, but also that those special characteristics are to be handled on a retail, individualized basis.

None of our analysis is dependent on any assumption that the Commission and Congress will not, ultimately, modify the 100:1 ratio. The Commission has effective power to make its decisions retroactive. This is because Congress has authorized the courts to reduce a sentence where the Commission has lowered the sentencing range after a defendant's sentencing and the reduction would be consistent with the Commission's "applicable policy statements." 18 U.S.C. § 3582(c)(2). The Commission lists its amendments for which it intends retroactivity, explaining that reduction under § 3582(c)(2) on the basis of amendments not so listed would not be "consistent with [its] policy statement" on the subject. U.S.S.G. § 1B1.10. This is the method that the statute contemplates for change, a method that, unlike appellants' proposed analysis, enables the Commission to make systematic efforts to minimize sentencing disparities.

As we understand our dissenting colleague's opinion, it turns on a proposition not advanced by either appellant, namely, that the 100:1 ratio "violate[s] § 3553(a)'s instructions that a court impose a sentence 'sufficient, but not greater than necessary' to 'reflect the seriousness of the offense' and 'provide just punishment.'" Dissent at 7. Because the issue was not raised by appellants, we do not pass on it, but we must note a few problems. First, it is far from clear that § 3553(a) provides a standard by which the Guidelines themselves are to be judged. It is in terms an instruction to the sentencing court, and, given § 3553(b)'s express provision for going *outside* the "range" determined by application of the Guidelines, would seem presumptively directed to the court's exercise of its discretion *within* that range. Second, if (1) § 3553(a) is a standard for evaluation of the Guidelines themselves, and (2) the 100:1 ratio violates that standard, then Congress has at best sent rather con-

tradictory signals in itself insisting on the 100:1 ratio in the mandatory minimum provisions of 21 U.S.C. § 841. Finally, if the Guidelines' 100:1 ratio is unlawful, then we should think the proper remedy would be to strike it down and substitute a lawful ratio, or at any rate the largest ratio that the Commission could lawfully adopt (rather than licensing every district judge to make individual adjustments); such a remedy would preserve a coherent treatment as between crack and powder offenders, at least within this circuit.

\* \* \*

The district court correctly decided that Congress's and the Commission's actions gave it no power to depart. The judgments are therefore

*Affirmed.*

TATEL, Circuit Judge, concurring in part and concurring in the judgment:

I join the judgment of the court and that portion of Judge Williams's opinion finding the appellants' position inconsistent with the Sentencing Commission's interpretation of 18 U.S.C. § 3553(b) as permitting departure only in atypical cases. I write separately because I do not entirely agree with Judge Williams's interpretation of § 3553(b) and because I wish to explain more fully why I am unpersuaded by a separate argument that appellant Hogan appears to have made in his briefs.

Section 3553(b) requires a sentencing court to impose a sentence within the applicable Sentencing Guidelines range "unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." Although I agree with Judge Williams that we should defer to the Commission's interpretation of § 3553(b), I do not share his view that § 3553(b) permits departures only when "the Commission has *completely overlooked* a factor ... or [when] the defendant's case manifests a circumstance that was considered but which is present in ... an extreme form." Opinion of Williams, J., at 439 (emphasis added). In my view, this interpretation ignores the word "adequately." Quite apart from the degree to which a circumstance exists in a particular defendant's case, the statute leaves open the possibility that departure may be warranted for circumstances "of a kind" to which the Commission gave *some* consideration, but not *adequate* consideration.

I would instead affirm the district court by relying exclusively on the Commission's policy statement interpreting § 3553(b). The Sentencing Commission has explained:

The Commission intends the sentencing courts to treat each guideline as carving out a "heartland," a set of typical cases embodying the conduct that each guideline describes. When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted.

U.S.S.G. Ch. 1, Pt. A, § (4)(b) (policy statement). As for the standard governing our review of this policy statement, Judge Williams views the statement as an interpretation of a statute, § 3553(b), thus suggesting that our review is governed by the standards set forth in *Chevron U.S.A. Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984). Judge Wald, in contrast, views the policy statement as an interpretation of the sentencing *guidelines* and thus suggests a more deferential standard of review. *Cf. Stinson v. United States,* 508 U.S. 36, 44–45, 113 S.Ct. 1913, 123 L.Ed.2d 598 (1993) (stating that the Commission's official *commentary* on guidelines is entitled to the same level of deference as that given to an agency's interpretation of its own regulation). To me, the question is close. Although the policy statement styles itself "an aid to understanding the guidelines," U.S.S.G. Ch. 1, Pt. A, § (4)(b) (policy statement), the statement's "heartland" discussion follows a quotation from § 3553(b) and could reasonably be viewed as interpreting that statutory provision. We need not decide precisely which standard of review applies, however, for we

all agree that, under either standard, courts must defer to the Commission's "heartland" interpretation of § 3553(b) if it is reasonable and not contrary to the Constitution, a statute, or a sentencing guideline.

On its face, § 3553(b) does not indicate whether each guideline should be viewed as carving out a "heartland" of cases in which departure will not be warranted or whether, instead, district courts may base departures on circumstances that are present in every case for an offense described by a particular guideline. The statute speaks merely of "an aggravating or mitigating circumstance ... that should result in a sentence different from that described." Because the language of the statute does not speak directly to the question whether departure should be reserved for atypical cases—and is not inconsistent with an interpretation restricting departure to such atypical cases—we must defer to the Commission's interpretation if it is reasonable and not contrary to law.

By virtue of its requirement of atypical circumstances, the Commission reads the statute to mean, at the very least, that a circumstance present in every case for an offense described by a particular guideline is not a "circumstance ... that should result in a sentence different from that described." This reading of § 3553(b) is reasonable. Allowing departure in every case for an offense described by a particular guideline would be equivalent to having no guideline at all for that offense. Under the Commission's reading, § 3553(b) does not give defendants a tool for attacking a guideline itself, but rather affords them an opportunity to demonstrate that their cases should not be treated as falling within a particular guideline. Although Anderson and Hogan advance a reasonable interpretation of § 3553(b), our task is not to choose among plausible readings of that provision, but to defer to the Commission's permissible and reasonable interpretation.

In light of the Commission's "heartland" interpretation of § 3553(b), I would distinguish *United States v. Smith*, 27 F.3d 649 (D.C.Cir.1994), differently than Judge Williams does. Whether the Commission completely failed to consider alien status—

the suggested ground for departure in *Smith*—is not the relevant distinction between that case and this one. Instead, what differentiates the basis for departure in *Smith* from the basis on which the appellants in this case seek departure is that permitting departures based on alien status leaves in place a "heartland" of cases described by a sentencing guideline. In contrast, Anderson and Hogan propose a basis for departure that would apply to all crack cocaine defendants.

Relying on the Commission's special report on cocaine sentencing, our dissenting colleague argues that application of the Commission's "heartland" interpretation of § 3553(b) to bar downward departures on the ground suggested by the appellants in this case would violate 18 U.S.C. § 3553(a), which provides that a sentencing court "shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing set forth in § 3553(a)(2). According to the dissent, § 3553(b), read in conjunction with § 3553(a), authorizes departures from Guidelines sentences even in cases that are typical for a particular offense if Guidelines sentences would be "greater than necessary" to serve the statutorily identified purposes of sentencing. Like Judge Williams, I disagree. In my view, § 3553(a) does not itself provide a standard for determining when departure is appropriate. *See United States v. Davern*, 970 F.2d 1490, 1492–93 (6th Cir.1992) (en banc), *cert. denied*, 507 U.S. 923, 113 S.Ct. 1289, 122 L.Ed.2d 681 (1993). Section 3553(b) provides that absent inadequately considered mitigating or aggravating circumstances, a sentencing court "shall impose" a sentence within the appropriate Guidelines range, and § 3553(a) itself instructs a sentencing court to consider the sentencing range for "the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines," 18 U.S.C. § 3553(a)(4)(A) (1994). Therefore, I read § 3553(a) as simply instructing a sentencing court how to select a sentence within an applicable Guidelines range or how to choose a sentence if departure is warranted under the standard set forth in § 3553(b).

The Commission's requirement of atypical circumstances may not completely answer what appears to be Hogan's separate argument. Although his position is not entirely clear, Hogan's briefs seem to claim that the Commission's special report discloses several factors—such as lack of violence—present in his case but not adequately considered by the Commission in establishing the sentencing guidelines for crack cocaine offenses. Although Hogan's counsel appeared to abandon this claim at oral argument, I address it separately because the interests of Hogan and Anderson, who were jointly represented at oral argument, may have differed with respect to this claim.

In my view, Hogan's argument fails because the relevance of the special report to a district court's inquiry under § 3553(b) is limited. Section 3553(b) states: "In determining whether a circumstance was adequately taken into consideration, the court shall consider only the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission." The Sentencing Commission ordinarily identifies its policy statements and official commentary as such, but has not so identified its special report on crack cocaine. Documents such as the report on crack cocaine still may be relevant to judicial determinations under § 3553(b). Like any other evidence, such reports may point out a factor that courts should examine as a possible mitigating or aggravating circumstance. Such reports may also contain information against which a court may measure the adequacy of the Commission's consideration of a factor. In the end, however, a court trying to decide whether and to what extent the Sentencing Commission did in fact consider an alleged mitigating or aggravating factor may rely for the answer to that question on the guidelines, policy statements, and official commentary only.

Hogan argues that the Commission failed to consider several mitigating factors present in his case. His offense, he asserts, did not involve violence, juveniles, large quantities of cocaine, or proximity to schools. As is clear from the materials that Congress has instructed courts to consult to determine whether the Commission adequately considered these factors, the Commission based sentences in part on the quantities of cocaine involved in an offense and identified violence, weapon use, and involvement of juveniles as circumstances justifying sentences higher than the base offense level sentences. Specifically, the Commission authorized upward adjustments for causing injury or death, U.S.S.G. § 5K2.1, p.s.; § 5K2.2, p.s.; for possession or use of weapons, § 2D1.1(b)(1); § 5K2.6, p.s.; for leadership in criminal activity, § 3B1.1; and for involvement of juveniles or drug sales near protected locations, § 2D1.2. The guidelines and policy statements thus demonstrate that the Commission predicated the base offense levels on the absence of these factors. Accordingly, the Commission did consider the kinds of circumstances that Hogan identifies and determined that the base offense level was appropriate under such circumstances. Hogan has not demonstrated that the Commission's consideration of these types of circumstances was inadequate. Although Hogan suggests that in setting the base offense levels for crack cocaine the Commission relied on assumptions about higher rates of violence and other evils associated with crack cocaine, he has not pointed to anything in the sentencing guidelines, policy statements, or official commentary to support this claim.

\* \* \*

From the appellants' perspectives, their sentences undoubtedly seem unfair. After all, the Sentencing Commission has essentially conceded that their prison terms are unjustifiably high in comparison to the prison terms of similarly situated powder cocaine defendants. But neither appellant has questioned the power of Congress or of the Sentencing Commission to establish the sentencing ranges that currently exist for crack cocaine offenses. The question before us, therefore, is whether district courts possess legal authority to depart downward in sentencing defendants charged with crack cocaine offenses on the ground that the Sentencing Commission failed adequately to consider certain information indicating that the existing differences in sentences for powder cocaine and crack cocaine offenses are unwarranted. Unfortunately for defen-

dants such as Anderson and Hogan, under the structure established by the sentencing statutes and guidelines, the answer is no. District courts lack authority to depart in these circumstances.

As Judge Williams explains, Anderson and Hogan may yet find relief. Congress has instructed the Sentencing Commission to "propose revision of the drug quantity ratio of crack cocaine to powder cocaine under the relevant statutes and guidelines in a manner consistent with the ratios set for other drugs and consistent with the objectives set forth in [28 U.S.C. § 3553(a) ]." Pub.L. No. 104–38, 109 Stat. 334, § 2(a)(2) (1995). If the sentencing range for crack cocaine offenses were in fact lowered, district courts would have authority under 18 U.S.C. § 3582(c)(2) to reduce the sentences of defendants already serving prison terms "if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." Absent such a development, however, we must affirm the appellants' sentences.

WALD, Circuit Judge, dissenting:

Appellants Oscar Anderson and Samuel Hogan asked the district court to grant a downward departure under § 5K2.0 of the Sentencing Guidelines [1] from their sentences of 121 and 78 months, respectively, for possession with intent to distribute crack cocaine. In support of these requests, both appellants argued that the findings in the Sentencing Commission's *Special Report to Congress on Cocaine and Federal Sentencing Policy* ("*Special Report,*" reprinted in Anderson Joint Appendix at A–42) regarding the unfairness of the 100:1 crack/cocaine sentencing differential constituted a mitigating circumstance warranting departure. The majority correctly points out that the Com-

mission's policy statement restricting § 5K2.0 departures to "atypical cases" would seem to rule out a departure request like this one, which rests on grounds that are common to an entire class of offenders. But I do not believe that the Commission's policy statement on atypicality should or can prohibit departure in this case. Although generally considered an authoritative interpretation of the Sentencing Guidelines, a policy statement does not bind federal courts if it violates the Constitution, a federal statute, or the underlying guidelines. *Stinson v. United States,* 508 U.S. 36, 45, 113 S.Ct. 1913, 1919, 123 L.Ed.2d 598 (1993). Here, the Commission itself has concluded that the crack/cocaine guidelines do not adequately reflect the relative culpability of crack offenders. A defendant sentenced under the current crack guidelines is therefore likely to receive a sentence which both the Commission and Congress admit is substantially greater than necessary to "reflect the seriousness of the offense" and "provide just punishment"—a result which violates § 3553(a) of the Sentencing Reform Act. 18 U.S.C. § 3553(a)(2) (1994). Since wooden adherence to the atypicality requirement in the face of these findings would prevent the district court from granting a departure even in the face of a violation of a federal statute, I do not see how it can be binding here and I conclude a departure is authorized.

In ruling that the policy statement on atypicality prohibited the district court from granting appellants a § 5K2.0 departure,[2] the majority defends the requirement as a reasonable gloss on § 3553(b) of the Sentencing Reform Act. Section 3553(b), my colleagues contend, permits departure only when a defendant (or the government, in the case of an upward departure) establishes that he should

---

1. Section 5K2.0 authorizes departures if "the court finds that an aggravating or mitigating circumstance exists that was not adequately taken into consideration by the Sentencing Commission in formulating the guidelines and that should result in a sentence different from that described." U.S.Sentencing Guidelines ("U.S.S.G.") § 5K2.0 (quoting 18 U.S.C. § 3553(b)).

2. Judge Williams offers several other reasons for affirming the district court's determinations in

both appellants' cases that it lacked authority to grant a § 5K2.0 departure. *See* Majority opinion ("Maj. op.") at 438–42. Because Judge Tatel's concurrence identifies the atypicality requirement as the fatal flaw in appellants' departure requests, *see* Tatel, J., concurring in part and concurring in the judgment, at 442, I take this point to be the grounds upon which a majority of this panel agrees the district court should be affirmed.

not be sentenced within the otherwise applicable guidelines range because the facts of his case are so unusual as to make the offense substantially and meaningfully different from the "heartland" of cases on which the relevant guidelines range was based. The atypicality requirement serves the Act's goal of uniform sentencing by forcing courts to abide by the Commission's guidelines, rather than using their departure authority to make an end-run around them. In all but the most extraordinary case, I take no issue with this view that the atypicality requirement acts as a permissible constraint on how the courts may exercise their departure authority and appropriately operates to deny a § 3553(b) departure where the defendant proffers only "typical circumstances" in support of his request. Like any policy statement or official commentary issued by the Commission, we defer to the atypicality requirement as an "authoritative guide to the meaning of the applicable guideline." *Williams v. United States,* 503 U.S. 193, 201, 112 S.Ct. 1112, 1119, 117 L.Ed.2d 341 (1992). In elaborating on this dictate, the Supreme Court has instructed us to review policy statements and official commentary which interpret or explain the guidelines with the same degree of deference accorded an agency's interpretation of its own legislative rules—a standard of review somewhat more deferential than the *Chevron*-style deference we accord the guidelines themselves as the Commission's interpretation of the Sentencing Reform Act. *Stinson,* 508 U.S. at 45, 113 S.Ct. at 1919 (quoting *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945)); *see also United States v. Smaw,* 22 F.3d 330, 333 (D.C.Cir.1994) ("We owe the Sentencing

Commission's commentary on its own guidelines the same treatment as we afford 'an agency's interpretation of its own legislative rules.' " (quoting *Stinson* )). Since the Commission's policy statement on atypicality explains how sentencing courts are to apply the various policy statements governing departures, *see* U.S.S.G. Ch. 1, Pt. A, § (4)(b), it strikes me as more like an interpretation of the guidelines, rather than a direct interpretation of the Sentencing Reform Act, and thus, like the official commentary in *Stinson,* reviewable as an agency's interpretation of its own legislative rules. But regardless of whether the appropriate standard of review is that applied in *Stinson* or the less deferential standard employed in *Chevron,* my colleagues and I agree that the atypicality requirement must be respected and departures denied if the circumstances upon which a defendant relies are common to an entire class of offenders—except, however, in those rare instances where its application would violate the Constitution, a federal statute, or the underlying guidelines.

The majority's analysis of this case is flawed because it stops short of asking the critical question: whether these cases fit into that very narrow category of circumstances where a policy statement or official commentary is *not* binding upon a sentencing court because it violates constitutional or statutory dictates.[3] In light of the findings in the *Special Report,* it seems to me that applying the atypicality requirement to deny departure authority would violate a federal statute—the Sentencing Reform Act itself. Section 3553(a) of the Sentencing Reform Act sets forth the factors a court must consider when sentencing under the guidelines, direct-

---

**3.** I do not disagree with the majority's conclusion that appellants' requests for departure fail the atypicality test. As compared with circumstances present in other crack offenses, the circumstances for which appellants seek departure are typical; the conclusions of the *Special Report* will apply as readily to the majority of crack cases as to the two cases before us. Appellants' arguments to the contrary are not availing. They claim that while the findings of the *Special Report* may be a circumstance common to all crack cases, they are not common to all federal drug offenses, which obviously include drugs other than crack. *See* Anderson Reply Br. at 6. This characterization inevitably raises the question,

"typical, as compared to what?" The answer implicit in the majority's opinion seems the right one: typical, as compared to other similar offenses. Since each type of controlled substance listed in the guidelines presents fairly unique risks of harm to the user and the surrounding community, the relevant group of similar offenses for determining the typicality of a circumstance is possession or sale of the same controlled substance which the defendant possessed or sold, not possession or sale of all controlled substances. Appellants' stated grounds for departure are typical, then, because they are common to all crack offenses, even if not to all federal drug offenses.

ing courts to impose a sentence which is "sufficient, but not greater than necessary" to achieve the goals of sentencing.[4] To guide the courts in determining when a sentence is "sufficient," § 3553(a) lists four purposes of sentencing:

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training,

medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2). Although the Commission does not expressly provide a specific vehicle for weighing these purposes in the sentencing process it outlines, *see, e.g.,* Kenneth R. Feinberg, *The Federal Guidelines and the Underlying Purposes of Sentencing,* 3 FED.SENT.R. 326 (1991), it is clear from the legislative history of this provision that Congress took the four purposes set out in the law seriously, and intended sentencing courts to do so as well.[5] In usual cases, it is reasonably assumed that the Commission's guidelines adequately reflect these purposes. But that assumption falls apart in the exceptional situation where the Commission itself admits that its guidelines do not accomplish

---

**4.** As my colleague Judge Tatel points out, § 3553(a)'s mandate to sentencing courts cannot be read in isolation from § 3553(a)(4), which instructs courts to consider the applicable guidelines range as one of the factors in determining sentence, as well as § 3553(b), which states that a sentencing court "shall impose a sentence ... within the [guidelines] range," unless it finds an aggravating or mitigating circumstance warranting departure. *See* Tatel, J., concurring, at 443–44. Judge Tatel would interpret § 3553(b) as governing the question of whether a court must sentence within the applicable guidelines range, and § 3553(a) as relevant only to the question of where within that range the sentence should be. *Id.* I see the intended interplay between these two provisions differently. Although a sentencing court should consider the factors set forth in § 3553(a) in determining where within the guidelines range a sentence should fall, those factors are also relevant to whether a departure under § 3553(b) is warranted in the first place. *See United States v. Clark,* 8 F.3d 839, 842 (D.C.Cir.1993) ("To qualify as 'mitigating' a circumstance must be linked to one of the stated purposes of sentencing, i.e., just punishment, adequate deterrence, public protection, or rehabilitation." (citing § 3553(a)(2) and *United States v. Mason,* 966 F.2d 1488, 1494–97 (D.C.Cir.), *cert. denied,* 506 U.S. 1040, 113 S.Ct. 829, 121 L.Ed.2d 699 (1992))). And just as with any other statutory provision, § 3553(a) is also relevant in deciding if application of a particular guideline, policy statement, or official commentary of the Commission—here, the policy statement on "atypicality"—is inappropriate because it would violate the Constitution or a federal statute.

**5.** In its section-by-section analysis of amendments to the Sentencing Reform Act, the House set forth its understanding of § 3553(a):

Section 3553(a) as enacted by the Sentencing Reform Act of 1984 requires that the court (1)

consider several factors, including the purposes of sentencing, and (2) "impose a sentence sufficient, but not greater than necessary, to comply with" the purposes of sentencing. Thus, if the court finds that the sentence called for is greater than necessary to comply with the purposes of sentencing, section 3553(a) would seem to require the court to impose a more lenient sentence.

Such an interpretation, it might be argued, is inconsistent with the Sentencing Reform Act's intention to limit judicial discretion in sentencing. That argument, however, is not convincing. The Sentencing Reform Act of 1984 limited, but did not eliminate, judicial sentencing discretion. Section 3553(a) does not give the court unlimited discretion in sentencing, but rather authorizes the court to depart from the guidelines only if the court finds that the sentence called for by the guidelines is greater than necessary to serve the purposes of sentencing.

133 CONG.REC. 31947 (Nov. 16, 1987). In fact, the House analysis of § 3553(a) goes even farther, suggesting that it may provide independent grounds for departure. *Id.* For additional remarks contemporaneous with passage of § 3553(a), *see* S.REP. No. 225, 98th Cong., 1st Sess. 52 ("The bill requires the judge, before imposing sentence, to consider the history and characteristics of the offender, the nature and circumstances of the offense, and the purposes of sentencing. He is then to determine which sentencing guidelines and policy statements [and mitigating circumstances] apply to the case."); 68 ("each of the four stated purposes should be considered in imposing sentence in a particular case"); 75 (same); 77 ("The intent of subsection (a)(2) is ... to require that the judge consider what impact, if any, each particular purpose should have on the sentence in each case") (1983), *reprinted in* 1983 U.S.C.C.A.N. 3182.

the four purposes of § 3553(a). To blindly adhere to the atypicality requirement even if doing so would plainly violate the mandates of § 3553(a) is to give no meaning at all to that provision—an interpretation which would be at odds with basic tenets of statutory construction. *See, e.g., Babbitt v. Sweet Home Chapter of Communities for a Great Oregon,* — U.S. —, —, 115 S.Ct. 2407, 2413, 132 L.Ed.2d 597 (1995) (expressing "reluctance to treat statutory terms as surplusage").

The nub of the problem here, of course, is that the *Special Report* is a startlingly forthright admission by the Sentencing Commission that its crack guidelines violate § 3553(a)'s instructions that a court impose a sentence "sufficient, but not greater than necessary" to "reflect the seriousness of the offense" and "provide just punishment." In the *Special Report,* the Commission stated, *inter alia,* that there was "sparse empirical evidence" supporting the proposition that crack was 100 times more dangerous to society than cocaine. *Special Report* at 195. The Commission further stated that contrary to Congress' intent to punish offenders in proportion to the quantity of drug sold, the 100:1 ratio resulted in higher penalties for street dealers, who are more likely to possess the drug in its crack form, than for suppliers, who are more likely to have larger amounts of the drug, but in its cocaine form: "Issues of 'fairness' or 'just punishment'—not to mention frustration of some congressional objectives—result when relatively low-level crack retailers receive higher sentences than the wholesale-level cocaine dealer from whom the crack sellers originally purchased the powder to make the crack." *Id.* at 193. In summary, the Commission concluded that

> [E]ven while agreeing that crack may be more harmful than powder cocaine,.... the Commission firmly concludes that it cannot recommend a ratio differential as great as the current 100–to–1 quantity ratio. Several factors lead the Commission to [this] conclusion.... First, when Congress established the quantity ratio in 1986, there were no sentencing guidelines; rather, the guidelines took effect in 1987 and were not fully implemented until 1989. Accordingly, Congress had only the possi-

bility of an enhanced ratio to look to in capturing, in a sentencing structure, the additional harms that legislators felt inhered in crack cocaine. Therefore, to the extent that the guidelines now provide a punishment for some of those same factors subsumed in the ratio, those factors generate an enhancement both through an increased ratio differential and through guideline adjustments.... Accordingly, if Congress believed that certain factors [such as carrying a gun or prior criminal activity] warranted a 100–to–1 quantity ratio and if the subsequently adopted guidelines provided a punishment for some of those factors, then, as a logical matter, the ratio should be lowered by an amount commensurate with the extent to which these factors are addressed by the guidelines.... Another central basis for the Commission's rejection of this ratio is the extreme anomalies in sentencing produced by such a high differential in penalties between two easily convertible forms of the same drug.... Similarly, although evidence suggests that the trafficking and use of crack cocaine have engendered more violence associated with marketing the drug than has powder cocaine, the evidence does not indicate that the increased level of violence and crime justifies a ratio as large as 100–to–1.

*Id.* at 196–97. Additionally, in the Commentary accompanying a proposed amendment which the Commission submitted to Congress that would have eliminated the sentencing disparity, the Commission stated that

> [S]ufficient policy bases for the current penalty differential do not exist. Instead of differential treatment of crack and powder cocaine defendants based solely on the form of the drug involved in the offense, the Commission concluded that fairer sentencing would result from guideline enhancements that are targeted to the particular harms that are associated with some, but not all, crack cocaine offenses. Harm-specific guideline enhancements will better punish the most culpable offenders and protect the public from the most dangerous offenders, while avoiding blanket in-

creases for all offenders involved with the crack form of cocaine.

60 Fed.Reg. 25,074, 25,076 (1995).

These acknowledgments by the Commission itself—that crack sentences raise "[i]ssues of 'fairness' or 'just punishment'" because they punish less culpable crack dealers far more severely than more culpable cocaine dealers and suppliers, and that no policy basis for the present 100:1 sentencing differential exists—make it impossible to square the crack guidelines with the sentencing purposes of § 3553(a).[6] For this reason, I believe a district court is authorized to disregard the atypicality requirement and, though it should proceed cautiously in this largely unchartered terrain, to grant a departure if it determines that application of the crack guidelines to the case before it will, in fact, plainly violate § 3553(a). ..

Several courts have already followed a similar course in parallel situations, setting aside commentary or policy statements as inconsistent with the Constitution, federal statutes, or the guideline provisions to which they refer. *See, e.g., United States v. Stevens,* 66 F.3d 431, 434–36 (2d Cir.1995) (declining to follow commentary to U.S.S.G. § 2J1.7, which requires sentence enhancement for persons who commit an offense while on release from prison, on the grounds that the commentary is inconsistent with the underlying guideline and statutory provision); *United States v. Powell,* 6 F.3d 611, 613–14 (9th Cir.1993) (courts must ignore commentary to U.S.S.G. § 3A1.2 in situations where the underlying crime is felon in possession of a firearm, because in such circumstances the commentary and guideline are inconsistent); *United States v. Lamb,* 6 F.3d 415, 420 (7th Cir.1993) (court not bound by commentary to U.S.S.G. § 3B1.3, "abuse of public trust" guideline, because it conflicts with guideline itself). One of our Third Circuit colleagues has gone even farther, suggesting that the statutory directive to impose a sentence "sufficient, but not greater than necessary" to meet the sentencing purposes set forth in § 3553(a) may even override the trial court's otherwise unfettered discretion in deciding whether to grant a departure,[7] and concluding that the district court may be *required* to grant a departure under § 3553(b) if a sentence is "plainly unreasonable" in light of § 3553(a)'s dictates. *United States v. Denardi,* 892 F.2d 269, 272 (3d Cir.1989) (Becker, J., dissenting). *Cf. United States v. Davern,* 970 F.2d 1490 (6th Cir.1992) (en banc) (reversing panel's decision that § 3553(a) requires courts to make an explicit determination in every case as to whether application of the guidelines is appropriate in light of the sentencing purposes set forth in the Sentencing Reform Act, before proceeding to calculate guidelines range and departures), *cert. denied,* 507 U.S. 923; 113 S.Ct. 1289, 122 L.Ed.2d 681 (1993).

Naturally, I do not suggest that a court should be permitted to depart whenever it decides that a sentence is greater than necessary to satisfy the purposes set forth in § 3553(a). Such a result would gravely undermine one of the central goals of the guidelines—restricting the discretion accorded sentencing judges, in the interests of eliminating unwarranted disparity in sentences. But this case is *sui generis* in the history of the guidelines. Here, the Commission itself has acknowledged that its crack guidelines bear no meaningful relationship to the culpa-

**6.** Judge Williams maintains that if this conclusion is correct, then Congress sent "rather contradictory signals" by enacting both mandatory minimums with a ratio of 100:1, and a standard for evaluating sentences (§ 3553(a)) which that very ratio arguably violates—implying that such a construction of § 3553(a) cannot possibly be correct. That argument ignores the chronology of these events. Congress enacted both § 3553(a) and the mandatory minimums *before* the research data which informed the Commission's findings in its *Special Report* became available. Although that research might indicate that the mandatory minimums, as passed by Congress, violate another statutory directive—the sentencing instructions contained in § 3553(a)—the two provisions were not in conflict at the time of enactment. The fact that Congress passed mandatory minimums, then, has no bearing on whether it intended § 3553(a) to operate as a substantive sentencing standard.

**7.** A district court's exercise of its discretion to deny departure is unreviewable unless the record indicates that the judge mistakenly thought she lacked authority to grant a departure. *United States v. Foster,* 988 F.2d 206, 208 (D.C.Cir.) (citations omitted), *cert. denied,* 508 U.S. 945, 113 S.Ct. 2431, 124 L.Ed.2d 651 (1993).

bility of defendants sentenced pursuant to them.[8] To my knowledge, the Commission has never before made such an extraordinary mea culpa acknowledging the enormous unfairness of one of its guidelines. For this reason, authorizing departures based on the *Special Report* could not conceivably start courts down the slippery slope of granting departures every time a defendant claims the guideline for his type of offense is unfair. Nonetheless, I realize the consequences of my position. Permitting departures by sentencing judges based on the Commission's *Special Report* has the potential for eroding the uniformity of sentences meted out to crack offenders. Although such a ruling would not require departures in the event a sentencing court found a plain violation of § 3553(a), a substantial number of district court judges might well find a departure appropriate, and they might not agree on how much to depart. The ensuing disruption in sentencing uniformity could be held in check, however, by limitations set on the extent of such departures by the appellate courts on review or on an interim basis by the Commission itself. Additionally, I would not anticipate that authorizing departures based on the *Special Report* would interfere in any way with the ongoing efforts by Congress and the Commission to develop a permanent solution to this disparity; regardless of what significance the courts assigned to the *Special Report* in the short term, any resolution of the issue which did not violate the Constitution, federal law, or the guidelines would presumably bind federal courts from that point forward.

Imposing a criminal sanction on defendants is a grave matter—perhaps the most serious act in our judicial system, which appropriately surrounds it with a wide array of procedural protections. Yet, ironically, if this were a run-of-the-mill administrative law case, I predict that we would not hesitate for a moment to vacate an agency's legislative rule, if the agency itself admitted that the rule was arbitrary, capricious, unfair, and violative of a federal statute, and then documented that admission with credible evidence. Defendants like appellants Anderson and Hogan, faced with inordinately lengthy terms in prison, should be treated similarly. Although we must give heed to Congress' goal of eliminating sentencing disparities in interpreting the Sentencing Reform Act, it seems to me the ultimate triumph of form over substance to base prison sentences on guidelines which have now been repudiated as irrational by the authors of those guidelines themselves. I would therefore find there is authority on the part of a district court to depart from the current guidelines governing crack cocaine offenses.

8. Judge Williams claims that a report authored and submitted to Congress by the Commission stands on exactly the same footing as "a report by a learned society." Maj. op. at 440. My colleague's position on this issue, quite frankly, makes no sense to me. Although it is true that a court may consider only the guidelines themselves, policy statements, and commentary in determining to what extent the Commission has "adequately considered" a circumstance, *see* § 3553(b), this provision certainly was not meant to bar judicial consideration of other statements by the Commission for purposes of identifying whether there were significant circumstances the Commission should have but did not consider. *Cf.* Tatel, J., concurring, at 443–44 ("such reports may point out a factor that courts should examine as a possible mitigating or aggravating circumstance"). That is, the courts may look to Commission statements other than those listed in § 3553(b) to ascertain what circumstances are relevant to formulation of a guideline, but then must confine its inquiry to the § 3553(b) sources when determining the adequacy with which the Commission considered those circumstances. One would think such consideration would be mandatory, not prohibited; surely the Commission as a data collection body must have significant expertise concerning the impact of its own guidelines, more so than an outside organization. In any event, this rule (whatever its proper construction) places no constraints on the use of other statements by the Commission for the purpose of determining whether a sentence would plainly violate § 3553(a), and thus is inapposite here.